UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80343-Civ-RYSKAMP/VITUNAC

| | |
|---|---|
| JOHN J. MCILVAINE, Individually and On Behalf of a Class of Persons Similarly Situated, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ARTHROCARE CORPORATION, MICHAEL BAKER, and MICHAEL GLUK, | ) ) |
| | ) |
| Defendants. | ) |
| | ) |

## AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.    SUMMARY OF THE ACTION ......................................................................1

II.   JURISDICTION AND VENUE .....................................................................5

III.  THE PARTIES...............................................................................................6

      A.   Plaintiffs ...........................................................................................6

      B.   Defendants ........................................................................................6

IV.   SUBSTANTIVE ALLEGATIONS ...............................................................9

      A.   ArthroCare's Relationship with DiscoCare ......................................9

           1.   Background and History of the Company ...................................9

      B.   ArthroCare's Spine Segment ...........................................................10

      C.   Spine Sales Stagnate .......................................................................12

           1.   ArthroCare Faces Reimbursement Hurdles ...............................12

           2.   Revenues Are Negatively Affected ...........................................15

      D.   The Solution.....................................................................................16

      E.   The Creation of the DiscoCare Model .............................................18

           2.   The DiscoCare Model and How it Worked ................................19

           3.   ArthroCare Encourages Upcoding to Raise Prices ...................21

      F.   The ArthroCare "How To" Guide.....................................................26

      G.   ArthroCare Rolls Out the DiscoCare Model.....................................29

      H.   The DiscoCare Model Was a Success ...............................................32

           1.   Spine Product Sales Spike ........................................................32

           2.   ArthroCare Inflates Revenues....................................................33

      I.   DiscoCare's Illicit Practices Come to Light .....................................34

           1.   Doctors and Distributors Avoid the DiscoCare Fraud...............34

      J.   The Market Raises Questions About DiscoCare ...............................35

V.      ARTHROCARE ENGAGED IN CHANNEL STUFFING.................................................42

        1.      Loading Up Distributors ............................................................................42

        B.      The Truth is Revealed.............................................................................................45

        C.      Post Class Period Revelations.................................................................................47

VI.     DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD
        STATEMENTS AND FINANCIAL REPORTING.........................................................48

        A.      False and Misleading Statements............................................................................48

        B.      Defendants' Violations of GAAP ...........................................................................105

                1.      ArthroCare Improperly Recognized Revenue, in Violation of
                        GAAP, on Purported Sales Transactions with DiscoCare ......................108

                        a.      ArthroCare Recorded Premature and Inflated Revenue in
                                Violation of the SEC's Revenue Recognition Requirements
                                Under Staff Accounting Bulletin 104 ..........................................109

                        b.      ArthroCare Recorded Improper and Unearned Revenue in
                                Violation of FASB Concepts Statement No. 5 ............................112

                2.      Arthrocare Improperly Recognized Revenue on Purported Sales to
                        Several Other Distributors Who Received Rebates, Kickbacks and
                        Other Incentives.......................................................................................113

                        a.      ArthroCare Recognized Premature and Inflated Revenue as
                                a Result of Providing Purchase Price Rebates to
                                Distributors, in Violation of the SEC's Revenue
                                Recognition Requirements Under Staff Accounting
                                Bulletin 104................................................................................113

                        b.      ArthroCare Recognized Premature, Inflated, and Fictitious
                                Revenue as a Result of Providing Certain Incentives to
                                Distributors to Engage in Channel Stuffing in Violation of
                                the SEC's Revenue Recognition Requirements Under Staff
                                Accounting Bulletin 104 and FASB Statement No. 48 ..............115

                        c.      ArthroCare Recognized Premature and Inflated Revenue as
                                a Result of Failing to Record Offsets to Revenue for
                                Rebates, Commissions, Fees, and Other Kickbacks Paid to
                                Distributors, in Violation of FASB EITF 01-9 ..........................117

                3.      ArthroCare's Disclosures Regarding Revenue Recognition Were
                        False and Misleading and in Violation of GAAP and SEC
                        Guidance ..................................................................................................119

4. ArthroCare Improperly Accounted for the Allocation of the DiscoCare Acquisition Purchase Price in Violation of FASB Statement No. 141 ................................................................................122

5. ArthroCare Failed to Reserve for Contingent Losses Associated with its Involvement in a Fraudulent Medical Billing Scheme, in Violation of FASB Statement No. 5 *Accounting for Contingencies* ......122

6. ArthroCare's Financial Statements Violated Fundamental Concepts of GAAP and SEC Guidance ...................................................123

VII. ADDITIONAL SCIENTER ALLEGATIONS ..............................................124

1. Individual Defendants' Suspicious Insider Trading ................................126

2. Individual Defendants Attended Meetings and Received Reports ..........129

3. Individual Defendants Undertook Due Diligence ...................................131

4. The Individual Defendants Received Enormous Bonuses .......................131

5. ArthroCare's Restatements Establish Scienter .........................................133

VIII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .............135

IX. LOSS CAUSATION ................................................................................137

X. NO SAFE HARBOR ...............................................................................146

XI. PLAINTIFFS' CLASS ACTION ALLEGATIONS .........................................147

COUNT I .....................................................................................................149

FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS .............149

COUNT II ....................................................................................................152

For Violations of Section 20(a) of the Exchange Act Against Individual Defendants ...............152

A. Declaring that this action may be maintained as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein; ....................................................................154

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; ...........................................154

C.  Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as their reasonable costs and expenses, attorneys' and experts' witness fees incurred in this action; and ..................................................154

D.  Such other and further relief as the Court may deem just and proper. ................154

XII. JURY TRIAL DEMANDED ...........................................................................................154

PRAYER FOR RELIEF ...........................................................................................................154

By and through their undersigned counsel, Lead Plaintiffs Iron Workers District Council, Southern Ohio & Vicinity Pension Trust and the Structural Ironworkers Local Union #1 Annuity, Pension and Welfare Funds (collectively, the "Iron Workers Funds" or "Plaintiffs") allege the following against Defendants ArthroCare Corporation ("ArthroCare" or the "Company"), Michael Baker ("Baker"), and Michael Gluk ("Gluk") (collectively, "Defendants") upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by ArthroCare and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on ArthroCare's website concerning the Company's public statements; (d) review of other publicly available information concerning ArthroCare, the other Defendants, and related non-parties; (e) consultation with experts; and (f) interviews with factual sources, including individuals formerly employed by ArthroCare and industry participants.

## I.     SUMMARY OF THE ACTION

1.      This is a federal securities class action against ArthroCare and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiffs bring this action on behalf of themselves and the Class under the Securities Exchange Act of 1934 ("the Exchange Act").  The Exchange Act claims allege that Defendants engaged in a fraudulent scheme and committed accounting fraud beginning on May 3, 2006 through July 18, 2008, inclusive (the "Class Period").  As a result of the fraud described below, ArthroCare's stock price fell from a Class Period high of $65.70 to $23.21, resulting in millions of dollars in shareholder losses.  The Company is now also facing multiple government investigations by federal authorities, including the SEC and FBI.

1

2.     ArthroCare is a medical device company that develops, manufactures and markets minimally invasive surgical products based on its Coblation technology.  ArthroCare's products, which it sells through distributors and a direct sales force, fall into three categories: Sports Medicine, ENT, and Spine.

3.     Throughout the Class Period, Defendants engaged in a myriad of accounting machinations aimed at artificially boosting the Company's revenues and inflating its stock price.  For instance, Defendants engaged in a practice known as "channel stuffing" in which the Company would load up its distributors and customers at the end of quarters, and at the end of the year, offering them significant discounts, free product and extended payment terms in return.  In such a way, ArthroCare could meet numbers and present a rosier picture to the market of its financial condition.

4.     In addition to channel stuffing, Defendants engaged in an illicit scheme with a secret sales agent to boost its revenues in one of its key growth business segments: ArthroCare Spine. ArthroCare has developed products known as SpineWands.  In particular, the Company sells SpineWands for use in treating herniated discs through a minimally invasive percutaneous discectomy procedure, which the Company referred to as nucleoplasty or Plasma Disc Decompression ("PDD").  After the Company's introduction of its SpineWands to the market, it experienced measured growth.  However, the reimbursement environment for the PDD procedure became increasingly difficult and, due to the fact that physicians and facilities had trouble getting reimbursement for this procedure, ArthroCare's Spine product sales stagnated in 2004 and 2005. Consequently, Defendants became desperate to find a solution to their reimbursement woes and capitalize on their technology.

5.     Defendants found a solution to achieve growth in the Spine segment and increase their market share in the Spine surgery market, which the Company views as "the most rapidly

growing segment of the orthopedic surgery market." ArthroCare learned of a successful "reimbursement" model being utilized by one of its customers in Florida and decided to capitalize on it. This customer, the Palm Beach Lakes Surgery Center, worked with a network of Florida personal injury attorneys at the Steinger, Iscoe & Greene law firm, among others, who would refer auto accident victims to them for PDD procedures. The physicians at the Palm Beach Lakes Surgery Center would perform the procedures and be paid out of the patient's settlement with his or her casualty insurer. In such a way, these physicians found a way to bypass reimbursement hurdles presented by traditional health insurers and get paid for PDD procedures.

6.       Through one of the physicians at the Palm Beach Lakes Surgery Center, a podiatrist by the name of Dr. Cutler, an entity known as DiscoCare, Inc. ("DiscoCare") was formed. DiscoCare was designed as ArthroCare's **exclusive** third-party biller and distributor of its PDD SpineWands and was headquartered at the Palm Beach Lakes Surgery Center. An ArthroCare employee named Michael Denker ("Denker") was sent over by ArthroCare to run DiscoCare. In conjunction with DiscoCare, ArthroCare formalized the Palm Beach Lakes "reimbursement" model into the "DiscoCare Model," a business model focused on creating a self-referring network of physicians, facilities and law firms who would work together to drum up patient business and seek payment for PDD procedures from settlements with casualty insurers, who did not scrutinize medical procedures in the way that traditional health insurers did. The DiscoCare Model benefited all of its participants. Significantly, ArthroCare had created a market for its previously undesirable SpineWands.

7.       Defendants were elated by the potential impact that the DiscoCare Model could have on ArthroCare's business. However, they also realized that there was an even better way to fatten their revenues and line their pockets. If they could encourage physicians to upcode PDD procedures to a higher billing code, physicians could charge three times as much for the same procedure. In

turn, ArthroCare could increase the price of its SpineWands. Ultimately, ArthroCare did just that. The Company created a step-by-step guide for its sales representatives, which taught them how to create a DiscoCare "network," implement the DiscoCare Model, and coach physicians to upcode. ArthroCare also jacked up the price of its PDD Spine Wands almost seven-fold from $1,150 to $7,500 for participants in the DiscoCare network. As detailed herein, numerous confidential witnesses disclosed how this outrageous price increase happened virtually overnight.

8.     ArthroCare's illicit scheme with DiscoCare was a success. ArthroCare's stagnating Spine product sales spiked. The Company had created artificial demand for its SpineWands and was selling them at elevated prices, causing its revenues and gross product margins to rapidly increase. In addition, during the Class Period, Defendants engaged in various accounting improprieties, defiantly flouting Generally Accepting Accounting Principles ("GAAP") in order to further artificially inflate ArthroCare's revenues.

9.     Although Defendants knew that the Company's extraordinary revenue growth was the result of their illicit scheme with DiscoCare and their accounting fraud, they, instead, told the market that their Spine revenue growth was a product of an improving reimbursement environment and success in their reimbursement efforts. As a result of these false and misleading statements and omissions, ArthroCare's stock price was artificially inflated during the Class Period, reaching a Class Period high of $65.70 on November 1, 2007.

10.     Eventually, ArthroCare's secret was revealed. Through a news posting made on December 11, 2007, the market first learned that ArthroCare was partnered with DiscoCare and the individuals at the Palm Beach Lakes Surgery Center. In the face of this revelation, Defendants immediately jumped into action, announcing a stock buy-back plan only three days later and denying any wrongdoing. On January 3, 2008, ArthroCare announced that it had acquired DiscoCare. This was the first time that the Company disclosed its relationship with DiscoCare to the market.

11.     As bits and pieces of information regarding DiscoCare and its purported illicit conduct made its way into the marketplace, artificial inflation came out of the stock as ArthroCare's stock price fell approximately 42% from its Class Period high.  In an effort to keep the full truth about their relationship with DiscoCare and their illicit scheme from being revealed, Defendant Baker dodged questions from analysts and outright lied to the market.  Defendant Baker's conduct had the intended effect of covering up the truth about Defendants' fraud and keeping ArthroCare's stock price artificially inflated.  However, the market would eventually learn the full truth about Defendants' massive accounting fraud.

12.     On July 21, 2008, ArthroCare announced that it would have to restate its financials. The market was stunned by this announcement, which stood in stark contrast to Defendants' previous statements.  Following this announcement, the price of ArthroCare stock plummeted another 42% to close at $23.21 per share on unusually high trading volume, and causing millions of dollars of investors' losses.  While investors were suffering, Defendants Baker and Gluk lined their pockets.  In fact, buoyed by their misrepresentations, the Individual Defendants unloaded 73.86% and 54.69% of their common stock holdings, respectively, for proceeds totaling over $16 million.

13.     Defendants' fraud did not go unnoticed.  On July 24, 2008, the Company announced that the SEC was conducting an inquiry related to its announced restatement announcement. Thereafter, on August 28, 2008, news of an FBI probe into the DiscoCare scheme became public. The FBI's investigation is currently believed to be headed up by the Bureau's Miami field office.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.  The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) and 28 U.S.C. §1331.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and (15 U.S.C. §78aa and 28 U.S.C. §1391(b)).  Many of the acts charged herein, including the fraudulent conduct that formed the basis of the dissemination of materially false and misleading information, occurred in substantial part in this District.  In fact, as further detailed below, Defendants' fraud is predicated on its illegal enterprise within this District, and the majority of witnesses and documentary evidence are located here.

16.     In connection with the acts, conducts and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities market.

## III.    THE PARTIES

### A.    Plaintiffs

17.     Lead Plaintiffs Iron Workers District Council, Southern Ohio & Vicinity Pension Trust and the Structural Ironworkers Local Union #1 Annuity, Pension and Welfare Funds were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated July 10, 2008 [DE 34].  Plaintiffs purchased ArthroCare securities at artificially inflated prices during the Class Period and suffered an economic loss when the true facts about the Company's business and financial condition were disclosed and the stock price resultantly declined.

### B.    Defendants

18.     Defendant ArthroCare is a Delaware corporation with its principal executive offices at 7500 Rialto Blvd., Building Two, Suite 100, Austin, TX 78735.  ArthroCare was incorporated on April 29, 1993 and became a public company in 1996.  The Company states that it designs, develops, manufactures and markets medical devices for use in soft-tissue surgery.  During the Class Period, the common stock of ArthroCare was actively traded on the NASDAQ under the symbol "ARTC."

19.     Defendant Baker joined ArthroCare in June 1997 as President, Chief Executive Officer ("CEO"), and was a director of the Company.  He has served in that capacity at all times material hereto.

20.     Defendant Gluk joined ArthroCare in December 2004 as the Company's Vice President of Finance and Administration.  In 2006, he was promoted to Senior Vice President, Finance and Chief Financial Officer ("CFO").

21.     Defendants Baker and Gluk are collectively referred to herein as the "Individual Defendants."

22.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of ArthroCare, were privy to confidential and proprietary information concerning ArthroCare, its operations, finances, financial condition and present, and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning ArthroCare, as discussed in detail below.  Because of their positions with ArthroCare, the Individual Defendants had access to non-public information about ArthroCare's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  As a result, the Individual Defendants are responsible for the accuracy of ArthroCare's corporate releases detailed herein and are therefore responsible and liable for the representations contained therein.

23.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to ArthroCare's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ArthroCare's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.    Each of the Individual Defendants is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ArthroCare's securities during the Class Period. Defendants had motives to pursue a fraudulent scheme in furtherance of their common goal (*i.e.*, artificially inflating the trading price of ArthroCare's securities, which was based in large part on ArthroCare's revenues and profit margins) by making false and misleading statements and concealing material adverse information.  The fraudulent scheme and course of business was designed to and did: (i) deceive the investing public, including Plaintiffs and other Class members; (ii) artificially inflate the price of ArthroCare's securities during the Class Period; (iii) cause Plaintiffs and other members of the Class to purchase ArthroCare's securities at inflated prices; (iv) allow ArthroCare to conceal and cover up the true financial condition of ArthroCare to the detriment of its investors, but to the financial benefit of ArthroCare and Defendants Baker and Gluk who unloaded massive quantities of ArthroCare stock at artificially inflated prices; and (v) substantially

cause the significant decline in ArthroCare's stock price as the artificial inflation was released, resulting in economic damages to Plaintiffs and the Class.

25.     The Individual Defendants by their status as executive officers of the Company were "controlling persons" of the Company within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of ArthroCare's business.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     ArthroCare's Relationship with DiscoCare

#### 1.     Background and History of the Company

26.     ArthroCare was founded in 1993, and is a multi-business medical device company that develops, manufactures and markets minimally invasive surgical products, many of which are based on its patented Coblation® technology.  ArthroCare is a global company with manufacturing facilities in the United States and Costa Rica and sales offices in the United States, Europe and Asia-Pacific.  The Company describes its mission as designing "surgical instruments that will improve patient outcomes by using our internationally patented Coblation technology."[1]  ArthroCare's Coblation technology uses radiofrequency energy to create a precisely focused plasma to ablate soft tissue. According to the Company, "[t]he use of Coblation allows surgeons to operate with a high level of precision and accuracy, limiting damage to surrounding healthy tissue and thereby potentially reducing patient pain and recovery times."[2]

---

[1]     *See* ArthroCare, About Us, http://www.ArthroCare.com/about_us/au_about_us.htm (last visited Sept. 24, 2008).

[2]     *See* annual report for the fiscal year ended December 3, 2007 filed on Form 10-K on February 29, 2008.

27.     ArthroCare has three core business units: (1) ArthroCare Sports Medicine, (2) ArthroCare Ear, Nose and Throat ("ENT"); and (3) ArthroCare Spine.  ArthroCare's Sports Medicine business unit sells its Arthroscopic System, which is used to treat a number of orthopedic conditions, including those involving knees, ankles, elbows, wrists, tendons and hips.  ArthroCare's ENT division focuses on the sale of three types of ENT devices: suction wands, channeling wands, and excision wands.[3]  ArthroCare sells its product through distributors and its direct sales force of sales representatives who work in their territories with hospitals, facilities and doctors to sell ArthroCare products.

## B.     ArthroCare's Spine Segment

28.     ArthroCare's third business segment is its Spine division.  ArthroCare has stated that it believes that "the spine surgery market represents the most rapidly growing segment of the orthopedic surgery market."[4]  Accordingly, the Company has focused many of its resources to research and development of SpineWands, surgical devices that use the Company's Coblation technology for the removal of disc tissue in herniated discs.   Herniation of a disc occurs when the outer layer of the disc bulges or ruptures.  Disc herniation can eventually cause back pain and pain that radiates to the extremities.

29.     In 2000, the Company introduced its Perc-D and Perc-DL SpineWands designed to remove tissue in the nucleus of the disc through a nucleoplasty, a minimally invasive partial discectomy utilizing the Company's Coblation technology.[5]  A nucleoplasty is also known as a

---

[3]      *Id*.

[4]      *Id*.

[5]      Nucleoplasty® refers to a minimally invasive percutaneous discectomy procedure utilizing the Company's Coblation technology to treat symptomatic patients with contained herniated discs. *See* 2004 annual report filed on Form 10-K on March 31, 2005.

Percutaneous Disc Decompression, and also referred to as Plasma Disc Decompression ("PDD").[6]

According to the Spine Regional Manager,[7] pain specialists were looking for a conservative, less-invasive treatment for younger patients whose activities were limited.[8]  However, this former employee described the SpineWand as "a difficult sell," because, at that time, neurosurgeons and orthopedic surgeons thought that this type of back and leg-related pain would resolve itself over nine months to a year if left alone.

30.     Accordingly, the Spine Regional Manager explained that the Company marketed the procedure as a non-invasive procedure that could be used to get patients back to normal activities sooner.  This witness further explained that although the nucleoplasty is a surgical procedure, since it is percutaneous, it is performed through a needle stick, and "it is no more of an insult to the soft tissues than would be an injection" like an epidural steroid injection.  This witness elaborated that "the recovery time was very quick."

31.     Moreover, the Spine Regional Manager explained that there were studies showing that the procedure had a positive affect on a certain number of patients, and that "we were able to move that forward."  In light of ArthroCare's marketing efforts, the Company experienced measured growth in its Spine products sales at least for several years after the introduction of these

---

[6]     Although ArthoCare manufactures numerous types of SpineWands, the SpineWands used to perform PDD procedures will be referred to as "SpineWands" herein.

[7]     The former regional manager for the area east of the Mississippi, was employed with the Company from January 2001 through April 2006 (the "Spine Regional Manager"). This witness started with the Company as Southeast Regional Manager for both Sports Medicine and Spine and became regional manager of the Spine division for the area east of the Mississippi after the Spine division split off into a separate division in 2002.  The Spine Regional Manager was tasked with setting up a sales force and promoting the sale of the SpineWands.

[8]     Throughout the Amended Complaint, all confidential witnesses will be referred to in the masculine to protect their identities.

SpineWands in 2000. For example, in the fourth quarter of 2001, Spine product sales were $805,000 and by the fourth quarter of 2003, Spine product sales were $4,341,000. The Company's growth in Spine product sales from 2000 to 2004 is illustrated in the chart below:[9]



### C.      Spine Sales Stagnate

#### 1.      ArthroCare Faces Reimbursement Hurdles

32.     The Spine Regional Manager then explained that the Company began to experience difficulties with third party reimbursement for SpineWands that caused business to level off significantly. As the number of PDD procedures being performed grew, the insurance companies – third party payers such as Aetna and Blue Cross Blue Shield – began to look more carefully at these procedures. The Spine Regional Manager further explained that "[the third-payers] had never really seen a volume of these [cases] being reported the way they were as we began to market this product. It became something that they [insurance companies] needed to address," because they were now paying out a lot of money. According to this witness, the insurance companies "looked at all the data and decided that this was something they shouldn't be paying for." The reluctance of insurance companies to provide reimbursement for the PDD procedures that utilized the SpineWands was also

---

[9]     This chart contains quarterly spine product sales from the Company's forms 10-K and 10-Q filed with the SEC.

confirmed by Jacqueline Brown, a former ArthroCare sales representative for Miami-Dade.[10]  She

testified that the SpineWand was difficult to sell because insurance companies did not consider it

medically proven.[11]  Indeed, health insurers nationwide would not reimburse for nucleoplasty

procedures because they found the procedures to be experimental or investigational.  For example,

Aetna has determined that nucleoplasty is "experimental and investigational for the percutaneous

decompression of herniated vertebral discs," and found that "there is inadequate evidence of the

safety and effectiveness of this treatment method."[12]  Likewise, Blue Shield of California has found

the procedure to be investigational and not eligible for coverage.[13]

33.    The Company's reimbursement issues with respect to the PDD procedures were

acknowledged by Defendant Baker.  Indeed, on the Company's fourth quarter 2003 conference call

on January 24, 2004, Baker stated that "reimbursement does continue to be our primary challenge,

and we don't realistically see any breakthrough in reimbursement in the coming months."

Moreover, he stated that "for the foreseeable future, we don't forecast any acceleration in

nucleoplasty revenue driven by any breakthrough in the reimbursement situation.  We think we're

going to continue to have to work on this for at least the next couple of quarters, if not longer."

Likewise, on the Company's fourth quarter 2004 earnings conference call held on March 15, 2005,

---

[10]    *See* Deposition Transcript of Jacqueline Brown taken on May 14, 2008 ("Brown Tr.") at 12, attached hereto as Exhibit A.  This testimony was given in *Silien v. Armchem Int'l Corp.*, No. 50 2007 CA 004357 XXXXMB AJ (Fla. Cir. Ct., filed Mar. 22, 2007).

[11]    *Id.*

[12]    *See* Aetna, Clinical Policy Bulletin: Nucleoplasty, attached hereto as Exhibit B.

[13]    *See* Blue Shield of California, Nucleoplasty Percutaneous Disc Decompression, attached hereto as Exhibit C.

Defendant Baker again stated that "the Nucleoplasty product line continued to be hampered by a lack of routine reimbursement by many private payers . . . ."

34.     The Company's reimbursement issues were also echoed by the Atlanta Territory Manager.[14]  According to this witness, the SpineWand was reimbursed under CPT code 62287.[15]  However, this former insider explained that another company, a predecessor to ArthroCare called IDET, had used that same code and had "tainted" it.  According to the Atlanta Territory Manager, IDET had abused the code and "they weren't even using the proper procedure for the code."  As a result of the tainted code, this witness explained that ArthroCare was not able to get reimbursed for procedures using this code.  He noted that "every pain management, anesthesiologist, and podiatrist in the free world could tell you what the IDET procedure is. We were actually doing what the code stated was being done, and they were still having problems getting paid for it because they [insurance] were saying – I'm sorry, we don't reimburse for the IDET procedure."  Moreover, this witness indicated that although doctors "loved" the PDD procedure, they were getting plagued by calls from their facilities complaining about the lack of reimbursement.

35.     Even where health insurers provided reimbursement for these procedures, the Spine Regional Manager explained that insurance companies started to capitate the reimbursements.  Up to this point, insurance companies had generally reimbursed the facilities performing the PDD for the procedure and the SpineWand separately.  However, the former Spine Regional Manager noted that as a result of insurance companies switching over to capitated reimbursements, the facility

---

[14]     The former area manager for ArthroCare in Atlanta, Georgia was employed with the Company from 2002 through 2004 (the "Atlanta Territory Manager").

[15]     As further detailed below, a Current Procedural Terminology ("CPT") code is a descriptive code assigned by the American Medical Association to a medical procedure, which is associated with a fee schedule set by Medicare, utilized by the medical industry at large.

performing the PDD would get only a facility fee that ranged anywhere from $600 to $2,000, but generally was in the range of $1,336. Since the SpineWand was selling for around $1,150 by the time this former employee left in April 2006, there was very little margin to do the procedures. With respect to hospitals, the Spine Regional Manager added that "it was very difficult for them, in some cases, to cost justify the procedure." According to the Atlanta Territory Manager, "it got to the point where doctors were only going to do it if patients were going to pay for it out of pocket." This combination of case denials and low reimbursements discouraged physicians from doing PDD procedures using ArthroCare SpineWands.

### 2. Revenues Are Negatively Affected

36.    As a result of health insurers' unwillingness to reimburse physicians and/or facilities for the wand and their capitation of reimbursements for the PDD procedure, Spine product sales flattened in 2004 and 2005. Beginning in 2004, there was clear stagnation in the growth of Spine sales, and in particular, wands utilized in PDD procedures, which is evidenced in the chart below:[16]



---

[16]    This chart contains quarterly spine product sales from the Company's 10-K and 10-Qs filed with the SEC. It is important to note that ArthroCare acquired Parallex in the first quarter of 2004 and that Parallex's revenue was incorporated into Spine revenues, giving them a boost. Accordingly, the Company's Spine revenue figures for its SpineWands were likely lower than these figures reflect.

37.     As detailed above by Defendant Baker's statements, the Company was concerned about health insurers' reluctance to provide reimbursements for the PDDs and the stagnating spine product sales that resulted. Moreover, the market was concerned about the reimbursement issues the Company was facing with its SpineWands. This was often the focus of analyst concern during conference calls in 2004 and 2005. This market concern put internal pressure on Defendants to address and overcome the reimbursement obstacles, as confirmed by the Spine Regional Manager, who noted that there was pressure to try to address the fact that the Spine business was very sluggish. Indeed, the Company had poured significant resources into the research and development of its SpineWands, and Defendants struggled to find a solution to the Company's reimbursement issues, to both boost stagnating spine sales and profit from the technology ArthroCare had developed. To this end, David Applegate, the former Vice President and General Manager of ArthroCare ENT, was transitioned to the position of Vice President and General Manager of ArthroCare Spine in 2004.

**D.      The Solution**

38.     Defendants discovered a beacon of hope in one of ArthroCare's sales representatives in Southeast Florida, a woman by the name of Jackie Marsh ("Marsh"). Marsh was having tremendous success selling SpineWands through a business model used by one of her accounts, the Palm Beach Lakes Surgery Center. The Palm Beach Lakes Surgery Center was located in Florida and run by Dr. Cutler, Dr. Gomez, Dr. Kugler, Dr. Simon and Mark Izydore, who the market would later learn had been convicted and served sixty months in federal prison on nine counts of conspiracy, wire, bankruptcy, and mail fraud in Texas.[17] This group of individuals had found a way

---

[17]     Towards the end of 2005 and the beginning of 2006, Dr. Cutler became the managing partner of the Palm Beach Lakes Surgery Center. *See* Deposition Transcript of Dr. Jonathan Cutler taken on August 10, 2007 ("Cutler Tr.") at 31, attached hereto as Exhibit D. Previously, this role was filled by Gary Carroll. *Id.* This testimony was given in *Coello v. Levine*, Case No. 50 2006 CA 006810 XXXX MB AB, (Fla. Cir. Ct., July 10, 2006).

to circumvent traditional health care insurance hurdles and get "reimbursements" for PDD procedures using the ArthroCare SpineWands. The Spine Regional Manager explained that these physicians and this surgery center had an arrangement with personal injury attorneys who would refer accident victims to them. Indeed, the Palm Beach Lakes Surgery Center had a significant relationship with the Florida law firm of Steinger, Iscoe & Greene, P.A., which referred its clients to the surgery center for PDD procedures. The physicians at the Palm Beach Lakes Surgery Center would do the procedure, which the Spine Regional Manager described as "fairly benign" on the auto accident victims and then settle with the insurance companies. This witness noted that everyone would get a third – "the patient would get a third, the lawyer would get a third, and the doctors and their surgery center would get a third." The Spine Regional Manager further elaborated that "this was a very good business model that they were using very successfully."

39. Indeed, Defendants did more than look at the Palm Beach Lakes business model. Defendants were so impressed with this model, and Marsh's success with it, that they encouraged the Company's sales representatives to employ it in all of their territories. For instance, at the national sales meeting in 2005, a former Denver Sales Representative[18] recalled that Marsh spoke to sales representatives about how he was able to increase sales and the volume of sales by having a surgeon that worked closely with personal injury lawyers. This witness mentioned the kind of money they were able to get doing it that way. This was confirmed by the Northern Texas Sales Representative,[19] who recalled that Marsh's model and its success were presented at the 2005 meeting. This witness also stated that sales representatives were encouraged to call on personal

---

[18] The former Denver sales representative left the Company in February 2007 ("Denver Sales Representative").

[19] The former sales representative for Northern Texas was employed with ArthroCare for four years and left the Company in January 2006 (the "Northern Texas Sales Representative").

injury lawyers. However, the Northern Texas Sales Representative noted that it did not sound like a good practice and a lot of people at the meeting were uncomfortable with this model and considered it "shady." This witness further stated that "there were several of us who were like — we didn't go into medical sales to call on personal injury lawyers."

### E. The Creation of the DiscoCare Model

40. Despite the moral and potential legal ramifications of the Palm Beach Lakes business model, Defendants were motivated by stagnant Spine sales to formalize this model to boost SpineWand sales. To accomplish this, the Company formed a joint venture with the Palm Beach Lakes Surgery Center to form an entity that would be the **exclusive** distributor and "third party biller" for ArthroCare SpineWands following the Palm Beach Lakes business model. On December 23, 2005, Dr. Cutler formed the DiscoCare entity and ArthroCare placed Denker, an ArthroCare sales manager who sold SpineWands, at the helm of DiscoCare as its "Director."[20] Moreover, Defendants tasked David Applegate with the leading charge on the ArthroCare side of the venture. Matthew Iscoe, the brother of Gary Iscoe, a partner of Steinger, Iscoe & Greene, was hired to work for DiscoCare as a sales manager.

41. Although ArthroCare was intertwined with DiscoCare, it attempted to give the appearance that DiscoCare was a completely separate entity. However, the Company would later admit its true relationship with DiscoCare in its restatement announcement. *See* ¶87 below. Irrespective of Defendants' later admission, it is beyond dispute that the two entities were intertwined from inception. Indeed, the Company's Florida-based subsidiary Device Reimbursement Services ("DRS") shared a fax number with DiscoCare. Moreover, although

---

[20] *See* Deposition Transcript of Michael Denker taken on May 22, 2008 ("Denker Tr.") at 4-5, attached hereto as Exhibit E. This testimony was taken in *Collins v. Hwa*, Case No. 50 2006 CA 01 2461 XXXX MB (Fla. Cir. Ct., Nov. 20, 1006).

DiscoCare's Florida registration materials listed its principal place of business as being located in Margate, Florida, DiscoCare's functional address was 2047 Palm Beach Lakes Boulevard – the very same address as the Palm Beach Lakes Surgery Center. In addition, former ArthroCare employee Denker did not report to Cutler, the CEO of DiscoCare.[21] Indeed Jacqueline Brown, a former ArthroCare sales representative for the Miami-Dade territory testified that she believed that Denker was an ArthroCare employee during this time.[22] She also testified that she was required to meet with Denker by her supervisors and that she met with him at the Palm Beach Lakes Surgery Center prior to starting with the Company.[23] In addition, Denker could be reached through ArthroCare headquarters even though he worked for DiscoCare, supposedly a separate Company.[24]

### 2. The DiscoCare Model and How it Worked

42. With the formation of DiscoCare and with Denker at the helm, Defendants began to formalize the Palm Beach Lakes Surgery Center's business model into what became known as the "DiscoCare Model." Following the lead of the Palm Beach Lakes business model, ArthroCare encouraged its network of sales representatives to establish a "network" of law firms, surgeons, pain physicians and facilities who referred business to one another. Personal injury law firms would refer clients, usually victims of minor car accidents, to physicians or surgical centers that were certified by DiscoCare as being trained in the PDD procedure, who actually performed the PDD procedures. To

---

[21] Although Dr. Cutler was technically the CEO of DiscoCare, Denker was given the title of "Director" and did not report to anyone. *See* Exhibit E at 5-6.

[22] *See* Exhibit A at 39 ("Q: Then it was your understanding when you talked to Mr. Denker that he was an ArthroCare employee? A: Yes.").

[23] *See* Exhibit A at 20-24.

[24] Seekingalpha.com, "Yet Another Subsidiary Operating in the Shadows at DiscoCare," January 23, 2008, http://seekingalpha.com/article/61292-yet-another-secret-subsidiary-operating-in-the-shadows-at-ArthroCare (last visited Oct. 8, 2008).

encourage physicians and/or facilities to get involved with the model, the protocol established by ArthroCare provided that physicians and/or facilities would receive Letters Of Protection ("LOPs") – letters promising payment for treatment upon settlement – from the referring law firm. In exchange for participation in the DiscoCare Model and in exchange for the LOP, DiscoCare would provide the physician and/or facility with ArthroCare SpineWands free of charge. DiscoCare would bill the law firm for the SpineWand, but would accept the LOP in lieu of payment.[25] The physician and the facility were not responsible for the cost of the wand used in the PDD. The physicians would then perform the PDD procedures on the personal injury clients using the ArthroCare SpineWands. Afterward, the physician and facility would provide medical records and bills to the personal injury attorneys for use in preparation of a demand letter to the appropriate liability carrier in preparation of settlement of the claims.[26] Once the insurers settled with the client, the physicians, facilities, lawyers, ArthroCare, and DiscoCare would get paid out of the proceeds.

43. Under the DiscoCare Model, since physicians and/or facilities received the ArthroCare SpineWands free of charge, and were guaranteed payment by the LOPs in the event of a settlement, there was little financial risk in doing these procedures. As a result, through the DiscoCare Model, physicians and facilities would be able to reap huge profits from PDD procedures with ArthroCare SpineWands, which they had previously found unprofitable. In such a way, ArthroCare was able to vastly increase the number of physicians and facilities in its "network" for purposes of selling SpineWands. Through the DiscoCare Model, ArthroCare had found a ready market for its SpineWands.

---

[25]    *Id.*

[26]    *Id.*

20

### 3. ArthroCare Encourages Upcoding to Raise Prices

44. In addition to creating demand for its previously undesirable SpineWands, Defendants sought to further capitalize on the DiscoCare Model by raising the price of the SpineWands. In order to justify charging higher prices for their SpineWands, Defendants needed to find a way to make PDD procedures even more lucrative for doctors. Defendants discovered that if surgeons changed the bill code for the PDD procedure, they could drastically increase their charges for the procedure. In turn, the law firm could use these inflated charges to increase the settlement demand to the casualty insurers so as to meet the liability threshold necessary to pressure them to avoid bad faith liability exposure and quickly settle claims with little scrutiny. Consequently, ArthroCare could increase the prices of its wands and elevate its revenues. In such a way, everyone in the "network" benefited.

45. Generally, all medical procedures are assigned a CPT code by the American Medical Association ("AMA"), which accurately describes the medical, surgical, and/or diagnostic service being performed. All CPT codes are associated with a Relative Value Unit ("RVU"), which quantifies the values of different procedures or services that are provided by a physician. Based on a procedure's RVU, Medicare associates relative payment amounts – the amount that a physician would be paid for that procedure under the Medicare fee schedule – with each CPT code. RVUs are also important outside of the Medicare context because they are utilized by private payers as a baseline for reimbursements.

46. ArthroCare knew that the appropriate CPT code for PDD procedures utilizing its SpineWands was 62287. Indeed, after ArthroCare first rolled out its nucleoplasty SpineWands, it hired Rheinisch Medical Management, Inc. ("Rheinisch"), consultants who specialize in medical coding and reimbursement strategies, to provide guidance on the proper code to be utilized for the PDD procedure. *See* Exhibit F, Plaintiffs-000003. Rheinisch contacted the AMA who determined

21

that CPT code 62287[27] was the appropriate code to use for the PDD procedure.  *See* Exhibit F, Plaintiffs-000016.

47.     Despite this, under the DiscoCare Model, ArthroCare advocated that surgeons use CPT code 63056[28] to bill for the PDD procedures, where in fact this CPT code was the appropriate code for an "open microdiscectomy" procedure, a far more invasive and complicated procedure. Indeed, a microdiscectomy involves a surgical procedure performed through an incision, in which the surgeon manually removes disc material that has protruded and is pressing on the nerve. Because of the invasive and complicated nature of the procedure, CPT code 63056 is associated with a significantly higher RVU than CPT code 62287, meaning that it can be billed for at a higher amount under the Medicare fee schedule.  ArthroCare used this code because "it paid three times more than 62287" and by billing under this code, a surgeon could get almost three times the compensation from the insurance company.

48.     While an open microdiscectomy is a substantially different procedure than a PDD, ArthroCare created a false justification for a surgeon's use of CPT code 63056 for the PDD procedure by telling surgeons that using a small incision to perform the procedure, instead of percutaneously (*i.e.*, through a needle), would reduce the risk of infection.  However, numerous medical sources confirm that a PDD does not require an incision.[29]  Indeed, the Spine Regional Manager indicated that the surgeons who were utilizing incisions were performing the same procedure.  "The only thing you could do, as you are inserting the needle you can make a stab

---

[27]     *See* Coding, Billing & Reimbursement Toolkit, July 2002, attached hereto as Exhibit F.

[28]     While CPT code 63057 is the corresponding cervical billing code, for ease of reference CPT codes 63056 and 63057 will be collectively referred to herein as 63056.

[29]     Composite Exhibit G, attached hereto.

incision in the skin and put a stitch in it when you close. It's really still a percutaneous procedure." This was confirmed by a former IMED Sales Representative,[30] who explained that the difference between code 62287 and 63056 was that one was for pain physicians and the other was for orthopedic and neurosurgeons and "that was billed as a surgical procedure."

49. Further, the IMED Sales Representative stated that "the surgeons would usually make an incision – it was basically a pin stick, what they did was, they would take a scalpel and they would make a tiny incision. It was basically a two stitch close." Indeed, ArthroCare's own materials reflect that it could be closed with "steristrips" (*i.e.*, a surgical band-aid). This witness explained that there was not a big difference using a needle versus an incision. Indeed, the IMED Sales Representative stated that "all of my surgeons were billing it as 62287 because they didn't see how it qualified as 63056." In fact, this witness had discussions with surgeons about this coding and they declined to use the upcoded code. The IMED Sales Representative noted that ArthroCare "gave us this whole write-up of why it should be billed as 63056 and I'd bring it to the surgeon's attention that he might be able to bill it like this, but they would always say no because they're not really making an incision."

50. This practice of using higher billing codes to demand higher charges for the same procedure is a fraudulent practice known as "upcoding." The Spine Regional Manager elaborated that "what the procedure is 62287, not a 63056 or 63057. I'm not a physician. Let me say this – it would clearly, if you spoke to a neurosurgeon or orthopedic surgeon familiar with this – I think they would clearly have issue with this." Moreover, this witness stated that he left the Company because of this practice and that he had raised real concerns about the business model prior to leaving the

---

[30] The former sales representative for the distributor IMED left that Company in October 2007 (the "IMED Sales Representative"). The IMED Sales Representative covered the northern New England region of the United States.

Company.  He further noted that "if there's one individual, it's David Applegate, the V. P. of Spine who's responsible for this.  If you want to look at a place, that's where you look.  This was his baby.  This was his idea, he pursued it, and drove the train.  I knew this was going on and I left.  This was Applegate's baby, but ***Baker and the Board went along with this.***"  Moreover, the Spine Regional Manager explained that billing codes were often discussed at meetings attended by sales managers, Applegate and Mike Moehring, the ArthroCare director of sales.  "We'd talk about these things in sales meetings and try to come up with what was appropriate in a marketing way, what we could communicate, and what we could tell our representatives to communicate."

51.     By encouraging upcoding in addition to creating false demand for its wands, ArthroCare was able to change the pricing of its SpineWands to further inflate its revenues.  In 2002, the SpineWands cost $975.  *See* Exhibit F, Plaintiffs-000009.  In early 2006, the Northern Texas Sales Representative recalled that just prior to DiscoCare, SpineWands were priced at approximately $1,150 for a lumbar wand and $1,350 for a cervical wand.  This was confirmed by the Spine Regional Manager, who recalled that SpineWands were selling for about $1,150 when he left the Company.  However, with the implementation of the DiscoCare Model, ArthroCare changed the price of the wand to $7,500 overnight.  This increase in the price of the SpineWands as a result of upcoding was confirmed by the Former Vice President of Marketing and Sales[31] who stated that "all of a sudden list prices went up ten-fold like overnight."  Significantly, this pricing was limited to members of the DiscoCare network because under the DiscoCare Model, the new price would not be subject to the same level of scrutiny.  This was confirmed by the testimony of Jacqueline Brown, the former Miami-Dade sales representative, who noted that traditional health care payers, like hospitals

---

[31]     The former Vice President of Marketing and Sales left ArthroCare in May 2006 ("Former Vice President of Marketing and Sales").

that did not participate in the DiscoCare Model would be directly billed by ArthroCare for $1,400.[32] Indeed, as a result of the DiscoCare Model, and its promotion of illicit upcoding, ArthroCare was now commanding $7,500 for a wand valued at $1,400, when the bill was to a casualty insurer in the settlement of an insurance claim.

52.     Former ArthroCare employees and distributors were shocked by the dramatic change in price.  For instance, the Spine Regional Manager noted that because DiscoCare was working under a different business model than a standard distributor – billing through personal injury insurers – they were buying the SpineWands at the significantly higher price of $7,500.  The Southwestern Distributor[33] explained that, when DiscoCare took over as a third-party biller, the wand price shot up.  He stated that "it was really astronomical, now we're going to bill it at $7,000, $8,000."  He commented that it seemed "outrageous" to him that the Company was selling wands for one price "and now all of a sudden with third-party billing its going to be $8,000 – how did you come up with that number."  Furthermore, the Northern Texas Sales Representative commented that "it certainly is shady when you have physicians that inventory, or have privately owned hospitals that are getting the wand for $1,150 but then you have a whole other slew of people paying $7500 for whatever – they're reimbursing it differently."[34]  The Gulf Coast Sales Representative,[35] who left just prior to

---

[32]     *See* Exhibit A at 28-32.

[33]     The former independent agent distributor for the territory between San Luis Obispo to the Mexican border was employed in this capacity for eighteen months and left the Company in December 2007 ("Southwestern Distributor").

[34]     Although the Northern Texas Sales Representative left the Company in January 2006, right after this witness left the Company he got calls from his customers complaining that ArthroCare had raised the price of the wands.

[35]     The former sales representative for the territory which included Louisiana, Mississippi, and the gulf coast of Alabama was employed with the Company for one year and left in January of 2006 ("Gulf Coast Sales Representative").

the increase in the wand price, was shocked to learn that ArthroCare had jacked the wand price up to $7,500. He stated, "Wow, for a single wand — I can't imagine anyone paying that because they were nickeling and diming me on the $1,500." The Texas/Oklahoma Sales Representative[36] who had left the Company before DiscoCare was initiated, indicated that he was surprised to learn that prices spiked up to $7,500, noting that reimbursement under billing code 62287 could never support that kind of expenditure.

### F. The ArthroCare "How To" Guide

53. As part of the DiscoCare Model, ArthroCare created a package of "DiscoCare Support Materials"[37] for its sales representatives, which was also available on the Company's extranet: http://info.ArthroCare.com.[38] This comprehensive guide was intended to assist ArthroCare sales representatives in employing the DiscoCare Model in their territories in order to increase participation by physicians, facilities and law firms in the DiscoCare "network," facilitate surgeons in upcoding PDD procedures, and maximize revenues associated with the DiscoCare scheme. To this end, the packet contained various protocols, prepared letters, checklists, and other forms.

54. For example, the DiscoCare Support Materials contained documents to be used to solicit physicians and law firms to participate in the DiscoCare network. The packet contained "Doctor Qualifier" forms to assist ArthroCare sales representatives in identifying physicians who were willing to upcode using CPT code 63056 in billing PDD procedures. *See* Exhibit H, Plaintiffs-

---

[36] The former sales representative covering Texas and Oklahoma was employed with ArthroCare from 2001 through 2004 (the "Texas/Oklahoma Sales Representative"). The Texas/Oklahoma Sales Representative sold SpineWands directly to surgeons.

[37] The DiscoCare Support Materials are attached hereto as Exhibit H.

[38] This was confirmed by Jacqueline Brown, the former sales representative for Miami-Dade, who testified that on the Company's internal internet system, information was made available on how to sell, the DiscoCare Model, and various DiscoCare forms. *See* Exhibit A at 36-38.

26

00081. In addition, the packet contained a prepared letter that a DiscoCare network surgeon could use to solicit new law firm clients for PDD procedures. *See* Exhibit H, Plaintiffs-000010, This prepared letter attempted to get the lawyer's attention by stating that they would "accept liens on your clients that are suffering from neck and back pain as a result of auto accidents" and that "[t]he disc decompression surgery ranges from $44,000 to $60,000 depending on the number of levels affected." *Id*. This stood in stark contrast to the prices ArthroCare listed for the PDD procedure in 2002 and 2005.[39]

55. Through this prepared letter, which requested that the law firm provide the physician with the liability limits on the patient's insurance policy, ArthroCare encouraged physicians to base their charges according to available insurance coverage. If a policy was large, physicians could inflate their charges through upcoding so that a patient's medical expenses were close to the limit on the insurance policy. When such astronomical medical expenses were included in the demand to an insurer, the insurer would frequently settle with the client quickly to avoid further exposure. On the other hand, the letter stated that "[i]f the patient has a $30,000 policy, we will need a minimum guarantee of $10,000 in order to perform the surgery." In this manner, ArthroCare ensured that it would receive payment for its SpineWands no matter what the policy limits.

56. Moreover, the packet contained various forms to assist network physicians and law firms in implementing the DiscoCare Model. For instance, the packet contained a "Standard Law Firm Protocol for Plasma Disc Decompression ("PDD") Procedures," and a "Medical Office Protocol for New PI Patients," which outlined all of the steps to be taken by these participants in the DiscoCare Model. *See* exhibit H, Plaintiffs-00008, Plaintiffs-000012. The packet also contained

---

[39] ArthroCare Spine, Cost Comparison, attached hereto as Exhibit I. *See also* Exhibit F, Plaintiffs-000038.

various forms for ArthroCare sales representatives to provide to personal injury lawyers to help them make medical determinations as to their clients' symptoms and refer them to DiscoCare network doctors, who would walk them through a checklist of steps ultimately ending in a PDD procedure. Through this assembly line approach created by ArthroCare, PDD procedures were being abused to drive up settlements with insurers and line ArthroCare's pockets.

57.     In addition, the DiscoCare Support Materials contained information to assist ArthroCare sales representatives in facilitating the upcoding of PDD procedures.  For example, the packet contained key talking points of Nikki Bryant, ArthroCare's National Sales Trainer, in which she specifically highlights coding.  Bryant advises that when talking to new surgeons or non-experienced PDD customers: "*I skim over 62287 and focus on 63056.*"  (emphasis added).  *See* Exhibit H, Plaintiffs-000093.  In addition, the packet also contained an ArthroCare Spine document entitled, "Program for selling the benefits of Plasma Disc Decompression to the Surgeons in your territory."  *See* Exhibit H, Plaintiffs-000098-99.  One of the ways the Company encouraged sales representatives to market PDDs by telling surgeons that "DiscoCare will provide the device to the facility at NO-CHARGE."  This document also contains a discussion of how to code a PDD.  *id*.  It states that "[i]n the opinion of several surgeons throughout the U.S. who have experience with Plasma Disc Decompression in the lumbar spine, CPT 63056, which is an open surgical code, may be the appropriate code to use for this procedure when an incision is made."[40]  *Id*.  Loudly absent from this document is any mention that these surgeons include ArthroCare's cohorts at the Palm Beach Lakes Surgery Center, Dr. Kugler and Dr. Jane Bistline, a pain specialist and anesthesiologist, who authored a step-by-step protocol for surgeons in performing PDD procedures.  *See* Exhibit H,

---

[40]     While this document contained self-serving and vague disclaimer language that it is "solely the responsibility of the surgeon to determine the correct CPT code," as detailed herein, Defendants aggressively pushed upcoding on ArthroCare sales representatives and their customers.

Plaintiffs-000020-26.  This protocol, also part of the packet and entitled the "Patient Selection and Protocol for Plasma Disc Decompression (PDD) Combined with Discography," suggested that "[p]rior to needle placement, a small incision is made in the skin" to reduce risk of transferring infectious agent.  *See* Exhibit A, Plaintiffs-000022.  Significantly, the protocol notes that following the PDD procedure, "the incision is closed with either a stitch or steristrips."  *See* Exhibit H, Plaintiffs-000025.

58.     Through the DiscoCare Support Materials, Defendants encouraged its sales representatives to establish a DiscoCare network, aggressively push PDD procedures even when not medically necessary, and guide physicians in upcoding.  In such a way, Defendants drove the illicit DiscoCare scheme aimed at boosting revenues and driving up ArthroCare's stock price.

### G.     ArthroCare Rolls Out the DiscoCare Model

59.     As the DiscoCare Model began to gain traction, ArthroCare sought to grow its network of physicians, facilities, and law firms by encouraging its sales representatives to expand the DiscoCare network in their territories and rolling out the Model nationwide.  In furtherance of this aim, ArthroCare presented the DiscoCare Model at its national sales meeting in 2006 in Costa Rica. The Denver Sales Representative provided insight regarding this meeting, recalling a discussion about DiscoCare, its formation, and what it could do.  Specifically, this former sales representative recalled that Mike Moehring and David Applegate were at this meeting, and that Denker made numerous presentations on the DiscoCare Model, such as how to line up doctors, talk to them about the Model, and "how to make it happen."  Moreover, the Denver sales representative explained that there was a discussion of upcoding at this meeting.  This witness explained that if it was a surgeon that was doing the procedure and not a pain management anesthesiology doctor, then they could justify using code 63056 and "that was the impression that was left, what was implied."  The Denver Sales Representative indicated that he never signed on to doing business with the DiscoCare Model

and that a lot of other sales representatives were uncomfortable with the DiscoCare Model and did not participate. However, he noted that the sales representatives did not voice their objections at meetings because they did not want to get fired.

60. Additionally, at another ArthroCare annual sales meeting, the 2007 Meeting of the Americas, a presentation was made to the sales representatives on physician profile and case submission.[41] This presentation explained the importance of "finding the right doctor" and using the "Doctor Qualifier Form" to "ensure[s] you are working with the right group." Moreover, the presentation noted that the perfect physician profile involves someone who is "looking for an increase in profitability" and is "open to 63056 or similar." In another slide on the topic of case submission, the presentation noted that case authorization forms are needed for every case and must be faxed or e-mailed to DiscoCare and "Nowhere Else!" At the meeting, a presentation was also made on "Implementing DiscoCare in the Practice." This presentation discussed the past, present and future with DiscoCare. It detailed how in the past, there was low physician and facility reimbursement, which also covered the price of the wand. The presentation noted that in the present with a "strategic alignment with DiscoCare," there was higher professional fee reimbursement and more revenue for facilities. It also described personal injury as a "***life-changing win for practices that 'Get it.'***"

61. To further assist the nationwide roll-out of the DiscoCare Model, ArthroCare encouraged its sales representatives to be trained by Denker and Marsh at DiscoCare headquarters. This was confirmed by the Michigan Sales Representative[42] and the deposition testimony of

---

[41] The presentation notes from the 2007 Meeting of the Americas are attached hereto as Exhibit J.

[42] The former sales representative for the state of Michigan was employed with the Company from March 2005 through January 2006 the ("Michigan Sales Representative").

Jacqueline Brown who testified that her supervisors at ArthroCare asked her to meet with Denker after she received the position.[43]  She also stated that her supervisors required her to meet with Marsh and spend a day with her, and that she met Marsh at the Palm Beach Lakes Surgery Center to observe cases.[44]  The IMED Sales Representative was also sent to the Palm Beach Lakes Surgery Center for training, where the SpineWand was demonstrated.  This witness recalled that he met a woman who was a pain physician, an orthopedic surgeon, and an accountant.  Moreover, the IMED Sales Representative recalls meeting Kugler and Marsh several times.  This witness explained that there were about nine people in the training group, and that all of the attendees besides himself were with ArthroCare directly.  In order to ensure tight control, network physicians were required to attend DiscoCare headquarters (the Palm Beach Lakes Surgery Center), for training with Dr. Kugler and Dr. Bistline in the PDD procedure.

62.     Moreover, ArthroCare sought to increase its sales force to augment its growing network by adding Regional Business Development Managers with juris doctorate degrees to drive new law firm business and implement the DiscoCare Model.[45]  The Company also attempted to drum up more business by supporting a "Blitz" in the summer of 2007, to get more law firm clients in order to roll out the Model in different areas of the United States.[46]

---

[43]      *See* Exhibit A at 24.

[44]      *See* Exhibit A at 16.

[45]      *See* ArthroCare's advertisement for a Regional Business Development Manager posted on September 23, 2007, attached hereto as Exhibit K.

[46]      *See* Exhibit A at 76-77.

### H.     The DiscoCare Model Was a Success

#### 1.     Spine Product Sales Spike

63.     The DiscoCare Model profoundly impacted ArthroCare's bottom line.  Indeed, the Spine business became the Company's highest growth division.  ArthroCare's booming Spine revenues were driven by two factors.  First, by creating a market for its SpineWands that did not previously exist, ArthroCare saw a spike in its Spine product sales.  Now that insurance reimbursement was not a hurdle and physicians and/or facilities received the wands for free, it was easy and lucrative for them to perform the PDDs.  This was especially true for those physicians who upcoded the procedures, and were getting rich quickly as a result.  In addition to selling more wands, DiscoCare customers were now paying $7,500 for SpineWands that had been priced at $1,150 - $1,350 in the beginning of 2006.  This combination of growing wand sales at inflated prices caused ArthroCare's Spine product sales to soar.

64.     This is illustrated by the chart below, which contains quarterly Spine product sales from the first quarter of 2004 through the first quarter if 2008.  Indeed, in third quarter of 2006, Spine product sales were $5,853,000, representing 9.42% of total product sales.  By the very next quarter, fourth quarter 2006, Spine product sales totaled $8,389,000, representing 12.49% of total product sales.  One year later, Spine product sales were $12,829,000, representing 15.18% of total product sales.  This dramatic growth is clearly demonstrated in the following chart:



2. **ArthroCare Inflates Revenues**

65. ArthroCare's revenue spike was also due to the Company's accounting improprieties in violation of Generally Accepted Accounting Principles ("GAAP"), as detailed in Section VI.B., below. During the Class Period, ArthroCare improperly and prematurely recognized revenue on sales to DiscoCare, a "straw man" utilized by ArthroCare to circumvent GAAP revenue recognition rules in order to record premature, inflated, and even fictitious revenue. For example, ArthroCare violated GAAP by recognizing revenue upon shipment of its products to DiscoCare, although payment for the products that ArthroCare shipped to DiscoCare was ultimately contingent upon the potential settlement of personal injury litigation. ArthroCare also improperly recognized fictitious revenue booked on sales of SpineWands at inflated prices because of fraudulent upcoding. In addition, ArthroCare violated GAAP by failing to disclose or reserve for foreseeable contingent losses related to its DiscoCare scheme to defraud insurance companies by inflating medical billings on certain personal injury cases, which exposed the Company to significant material current and recurring future costs and liabilities when the truth about the Company's fraudulent billing practices came to light. As a result of the various machinations of accounting fraud leading to overstated revenues and misstated financial statements, ArthroCare's stock price was inflated during the Class Period.

## I.   DiscoCare's Illicit Practices Come to Light

### 1.   Doctors and Distributors Avoid the DiscoCare Fraud

66.   ArthroCare's fraudulent practices did not go unnoticed.  Many doctors refused to participate in the DiscoCare model, recognizing that is was nothing short of an insurance scam.  Indeed, one doctor wrote an e-mail to Bear Stearns analyst, Raj Denhoy, warning that personal injury attorneys were working together with some local orthopedic surgeons to secure big insurance payouts for unnecessary PDD surgeries.[47]  The doctor claimed that ArthroCare in conjunction with DiscoCare had been promoting an insurance scam.  Another Palm Beach physician noted that the PDD is done for litigation purposes only, and that there is no evidence to show that the procedure even works.  *Id*.  This physician commented that the only person who is not a candidate for the procedure, is the person who does not have enough liability coverage.[48]

67.   In addition, distributors refused to get involved with the Model, because they found it morally suspect.  The Spine Regional Manager indicated that after he left ArthroCare, he spoke to a number of distributors who had been doing a significant amount of business with the Company, but no longer desired to be affiliated with ArthroCare.  This witness stated that "they were being told to distribute it, market it in a way, in a way that they were not comfortable with."  The distributors' concerns about the DiscoCare Model were confirmed by an ArthroCare Distributor[49] who was approached about the Model by ArthroCare representatives who wanted the distributor to stock the Company's SpineWands.  He stated, "we looked at that model and we stayed away from it."  The

---

[47]   *See* TheStreet.com, Melissa Davis, *Dr's Question Relationships in ArthroCare's Device Sales*, March 25, 2008, attached hereto as Exhibit L.

[48]   *Id*.

[49]   The ArthroCare distributor works as a distributor of ArthroCare products in Connecticut ("ArthroCare Distributor").

ArthroCare Distributor further noted that "it just didn't seem legal. It's not right -- what they're doing is not right. What it is, is getting a doctor and having a doc partner with a personal injury attorney, the personal injury attorney sending the patients to the doc, and the doc sticking a wand in somebody's back. It's not what we do."

68. Moreover, the ArthroCare distributor added that

> what I'm talking about is morally wrong, what they're trying to do is, they get some aggressive surgeons to partner up with a big personal injury attorney. What the personal injury attorney does is, he sends the patients to the surgeons, the surgeons agree to see that patient immediately – like, Hey Mark, I'm sending you over a patient okay, they'll be in the office in an half an hour, I need you to give them a workup and they stick the wand in the patient's back and it increases the settlement like four or five times. It's like a do no harm procedure. What happens is, this goes deeper than that, the personal injury attorney is the one – the surgeon does the procedure – this is the part that kinda made my senses tingle a little bit – what happens is, you get this kinda self referral pattern going where you have the personal injury attorney, the surgeon and the rep. The surgeon doesn't get paid until the attorney gets his settlement. When the attorney gets the settlement, the attorney gives part of the settlement to the rep, then the rep pays the surgeon. The attorney doesn't pay the surgeon, the attorney pays the rep, the rep pays the surgeon. They're getting paid about $20,000 for sticking this wand in people's backs for about eight minutes.

This witness indicated that what the doctors were doing was highly illegal, stating that "it's self referring, an attorney is telling them to stick a fucking wand in this guy's back -- yeah, okay, no problem -- to increase the settlement." The IMED Sales Representative noted that after about two years with IMED, he started pursuing other options when IMED switched over to the DiscoCare Model. He stated that "I actually left the company, because it sounded fishy, I got out. Combining medical and personal injury, it didn't sound right to me and it just didn't sound legitimate."

**J.     The Market Raises Questions About DiscoCare**

69. In addition, the market eventually began to learn of DiscoCare and its illicit scheme with ArthroCare. Although ArthroCare had been a joint venture with DiscoCare for nearly two years, it never mentioned DiscoCare in its public filings, keeping it a secret from the market. On

December 11, 2007, the market first learned about DiscoCare when the New York Post posted an

article stating:

> A high-flying surgical device maker that has not disclosed the crucial role a small
> Florida company plays in fueling its growth is raising eyebrows among hedge funds.

> In its Securities and Exchange Commission filings, Austin, Texas-based Arthrocare
> doesn't mention the role that DiscoCare, a Margate, Fla.-based surgical device
> distributor, has in boosting Arthrocare's fast-growing spinal unit.

> Nor have Arthrocare officials mentioned the spinal unit's reliance on DiscoCare at
> several recent investment conferences during which the unit's prospects were
> promoted.

> However, it turns out that Arthrocare gets millions of dollars annually in insurance
> reimbursements for its experimental spinal wand treatment from DiscoCare.

> The profit growth from the DiscoCare relationship has helped Arthrocare's stock
> surge to $55 from $41 over the past year.

> During that time, Chief Executive Michael Baker has sold more than $12 million in
> stock. He has 78,000 shares, valued at just under $4.1 million, left.

> Already, the Massachusetts Attorney General's office is looking into the companies'
> ties.

> In an e-mailed statement to The Post, Baker said, "This information stems from
> rumors being spread by hedge funds that have neither ArthroCare's shareholders' or
> patients' best interests at heart."

> The connections between the two companies run deep.

> West Palm Beach, Fla.-based podiatrist Jonathan Cutler founded DiscoCare in late
> 2005, but Michael Denker, a former Arthrocare sales executive, runs its daily
> operations, according to a deposition obtained by The Post. The two companies also
> share letterhead in a marketing pitch to surgeons touting DiscoCare's "unequalled
> reimbursement support," according to a copy of the materials that was obtained by
> The Post.

> Matthew Iscoe, until two weeks ago DiscoCare's Western regional sale manager,
> told The Post that his former company did, "about 75 percent of the [Arthrocare]
> spinal unit's US business." Based on the most recent company filing, that amounts
> to just over $23.8 million for the first nine months of the year.

> Iscoe told The Post that DiscoCare got upward of "50 percent" approval for
> procedures using Arthrocare products while medical office staff "wound up [getting]
> around 15 percent."

He attributed the approval discrepancy to DiscoCare's "experience and expertise."

According to an Arthrocare help-wanted ad that was briefly listed on a Yahoo! Jobs Web site, a key aspect of its business model is developing a network of personal injury lawyers willing to refer their clients to DiscoCare for treatment under "the DiscoCare model."

Coincidentally, Iscoe, the former DiscoCare sales manager, is the brother of Gary Iscoe, founding partner of Steinger, Iscoe & Greene, one of South Florida's largest personal-injury law firms.

Sources told The Post that the firm is the biggest referrer of patients to DiscoCare for treatment using Arthrocare products.

Cutler, meanwhile, is also a partner in The Palm Beach Lakes Surgery Center, which performs procedures using Arthrocare products. The man who runs the surgical center, Mark Izydore, has an extensive legal history that includes a 60-month federal prison sentence in 1995 for a variety of counts including bankruptcy fraud and wire fraud.

70.     Three days later, on December 14, 2007, in response to this article, which stated that DiscoCare was the driver of the Company's Spine growth, ArthroCare issued a press release announcing that the Company would buy back up to $75 million worth of its outstanding common stock.  This press release also commented on and denied allegations in the New York Post article. Although the Company's press release did not mention DiscoCare specifically, Defendant Baker stated that "[w]e have carefully reviewed the business practices of our service provider and have found no evidence of anything improper in their activities. In fact, we believe that the application of a disciplined diagnostic and treatment algorithm improves patient selection and outcomes, and that the involvement of experienced professionals in the reimbursement process significantly decreases the chance of administrative errors."

71.     Thereafter, on December 31, 2007, ArthroCare formally acquired DiscoCare.  It was not until January 3, 2008, when the Company informed the market of this acquisition, that Defendants finally disclosed their two-year old relationship with DiscoCare to the market. Accordingly, ArthroCare's acquisition of DiscoCare from Dr. Cutler for $25 million immediately in

the aftermath of the New York Post article was nothing short of suspicious. In addition, as the Company's restatement announcement would later reveal, this acquisition was suspicious in timing in that it came just as the Company was in the midst of preparing their annual report, with their auditors reviewing their financial statements.

72.     The DiscoCare Acquisition was particularly suspicious given the relationship between DiscoCare and ArthroCare, as these entities were already one and the same. According to the Senior Cost Accountant,[50] "we knew internally that DiscoCare was already ours, and then they announced formally that they acquired it. We had an inside relationship. They did a whole line of business for us. They had our inventory, but it was our inventory. It was our inventory, it was our product. We had a DiscoCare inventory." Moreover, the Senior Cost Accountant noted that they both shipped actual inventory to DiscoCare and held inventory for them and that DiscoCare would pay for the product when it got used. This witness stated "I wasn't on the receivables side of it but I know that part of it was a nightmare in itself. They had special terms, different than our other customers. We were in bed with them somehow." Further, this witness noted that the arrangement involved ArthroCare progress-billing DiscoCare and recognizing revenue and that DiscoCare was one of ArthroCare's biggest receivables.

73.     As a result of ArthroCare's true relationship with DiscoCare, although ArthroCare had booked revenue on its apparent shipment of product to DiscoCare, this inventory actually remained in ArthroCare's warehouse or was technically still ArthroCare's because DiscoCare had not yet paid for it. In such a way, ArthroCare materially overstated its revenues and inflated its accounts receivable reported in its public financial statements issued during the Class Period. This

---

[50]     The former senior cost accountant was employed with ArthroCare from August 2006 through August 2007 ("Senior Cost Accountant").

practice also led to a growing stockpile of excess inventory at DiscoCare during 2007. This enormous stockpile of excess inventory all came back to ArthroCare when the two entities formally merged. The forced reacquisition of the inventory that ArthroCare had purportedly previously "sold" to DiscoCare was material, and caused ArthroCare's total inventory to balloon by 15% over the level reported in the third quarter 2007 Form 10-Q.

74. ArthroCare's suspicious acquisition of DiscoCare did not go unnoticed. On the January 3, 2008 conference call with analysts concerning the acquisition, the market began to raise questions concerning ArthroCare's relationship with DiscoCare, and DiscoCare's illicit practices. Rather than reveal the truth about the Company's relationship with DiscoCare, and its involvement in fraud, Defendants repeatedly denied any wrongdoing, or patently refused to answer questions on the acquisition altogether. Through their lies and evasion, Defendants endeavored to keep the truth hidden from the market and maintain an appearance of legitimacy.

75. For instance, although ArthroCare had created a step-by-step guide to promote the aggressive use of PDD procedures by its customers, encouraged its sales force to implement the DiscoCare Model and drum up new business with physicians who "get it," on the Company's January 3, 2008 conference call, Defendant Baker told the market:

> The DiscoCare model for ArthroCare's Plasma Disc Decompression procedure **is actually a highly disciplined treatment algorithm** that we believe is the key to successful authorizations and a significant contributor to excellent clinical outcomes . . . .

76. Defendant Baker also touted the due diligence undertaken by the Company as part of the acquisition in light of the questions being raised in the market:

> **In our acquisition due diligence, we found no evidence that PDD is being used overly aggressively or inappropriately by any of our customers who follow the DiscoCare treatment algorithm . . . .**

*    *    *

*. . . Like all of our marketing initiatives, the entire DiscoCare program has been carefully vetted and subjected to extensive legal and regulatory review.*

\* \* \*

In the course of considering the acquisition of DiscoCare, we have not only conducted the normal extensive due diligence as we would with any acquisition, but *we also completed additional due diligence work focused on the false and misleading information underpinning these stories.*

\* \* \*

We have actually been talking about this for awhile. And we were in the middle of it when all of this stuff broke out, which obviously -- when we started hearing these stories that were really off the wall and they did make any sense, but we did take extra time to go back and actually look at the facts behind some of these stories. And what we found was kind of what we just told you. *That a lot of this stuff was either completely false or so misrepresented that it did not make any sense.*

77.    Although this was the first time the market had learned of DiscoCare despite ArthroCare's two-year relationship with this entity, Defendant Baker refused to explain how much of the Company's business was driven by DiscoCare:

**Brian Wong  - Broadpoint Capital - Analyst** - Thanks for holding the conference call. I just wanted to ask you a couple of questions. Would you care to delineate how much of your business has been driven by DiscoCare?

**Mike Baker - ArthroCare - President & CEO -** *No*, I mean, as you know, Brian, we have a long-standing policy that we don't break out business by productline, we don't break it out individual businesses by geography, and we certainly don't break it out by marketing strategy. *So we are not going to do that.*

As I think we've talked about before, the data that was in the New York Post article was incorrect. But beyond that, the thing that is important to understand is that *DiscoCare was very helpful.* I mean they were very helpful in helping us understand what this algorithm had to be to be effective in getting preapproval. . . .So there is no question that they have been helpful, *but in terms of breaking out exactly what we did with them, we're certainly not going to do that.*

\* \* \*

**Brian Wong  - Broadpoint Capital - Analyst -** Is it fair to say then that the percentage of business was substantially less than what was quoted in the article?

**Mike Baker - ArthroCare - President & CEO -**It would have had to have been; otherwise, *it would have risen to the level of something we might have had to disclose.*

78.     In addition, although ArthroCare had encouraged its sales representatives to push use of CPT code 63056 for PDD procedures, and provided numerous materials to them to "assist" their customers in coding, when asked to clarify research reports concerning coding discrepancies and miscoding, Defendant Baker stated:

> Well, as I said in the prepared comments, we don't code for physicians, full stop, and we don't code for facilities. I know there are some firms out there that do that, but DiscoCare is not one of the firms that does that. We don't code for surgeons. We don't code for facilities. We don't code for hospitals. ***And we don't tell them how to code.***

79.     Defendant Baker also dodged questions about DiscoCare's operations and financial condition:

> ***Dave Turkaly - SIG - Analyst*** - Just a couple of other details. How long was DiscoCare in business? I know you do not want to disclose the revenues, but can we get an idea just in general terms maybe what are they growing at and what their margins look like just to look at this acquisition from some sort of metric standpoint?
>
> ***Mike Baker - ArthroCare - President & CEO-  No, I do not think we're going to disclose any of that. I think they have been around a little over two years, but I don't think that we need to disclose nor are we planning on disclosing any of their financial details.***

80.     Likewise, on the Company's fourth quarter 2007 Earnings Conference Call held on February 19, 2008, Madison Spencer of Morgan Stanley questioned Defendants about why DiscoCare and DRS shared a fax number.  Defendant Baker responded defensively, telling the market it was a mistake, in order to cover up ArthroCare's relationship with DiscoCare:

> ***Madison Spencer - Morgan Stanley - Analyst -*** Hi, guys. There seems to be like an elephant in the room. Maybe you can clarify it. You acquired DiscoCare on December 31st of '07. Your subsidiary, Device Reimbursement Services, shared a fax number with DiscoCare back in September, and October and November. Can you just explain that? Were you guys in the same company back then? Did you have a joint venture with them back then?
>
> ***Mike Baker- No, it was just a mistake on the website.***
>
> ***Madison Spencer - Morgan Stanley – Analyst-***  How did you - You mistakenly had the same fax number as DiscoCare? That's a coincidence.

41

*Mike Baker -* The same people developed the website for DRS that developed the website for DiscoCare, and ***they just put the wrong fax number on it.*** As soon as someone pointed it out, we corrected it.

*Madison Spencer - Morgan Stanley – Analyst-* It took you six months to notice that you had the wrong phone number?

*Mike Baker -* The DRS subsidiary, to be clear, the people are located here in Austin. The subsidiary was established in a different place than DiscoCare. So, do you have another question or is that it?

*Madison Spencer - Morgan Stanley – Analyst- Yes, but you didn't answer this question yet.* It also says it is located in Sanford, Device Reimbursement -

*Mike Baker --* That's right.

*Madison Spencer - Morgan Stanley – Analyst-* Is it located in Sanford?

*Mike Baker -* That's where it is incorporated, yes.

*Madison Spencer - Morgan Stanley – Analyst-* No, is it located there though?

*Mike Baker --* We have a facility in Sanford, and that's where that is located, just like -

*Madison Spencer - Morgan Stanley – Analyst-* So the warehouse in Sanford is where you run it out of?

***Mike Baker - Operator, can we move on to the next caller, please?***

81.     Through Defendant Baker's false assurances and outright lies to the market, along with his evasions of legitimate questions, he was able to continue to cover up the DiscoCare scheme and succeed in keeping the price of ArthroCare stock artificially inflated.  However, it was just a matter of time before the truth regarding ArthroCare's relationship with DiscoCare would be revealed to the market.

## V.     ARTHROCARE ENGAGED IN CHANNEL STUFFING

### 1.     Loading Up Distributors

82.     ArthroCare's Class Period fraud was not limited to DiscoCare.  Defendants also engaged in channel stuffing by improperly recognizing revenue on products they loaded on distributors and physicians.  As detailed herein, the Company booked revenue from numerous sales

to distributors and customers upon shipment, where it was offering them tremendous discounts, extra products, and extended payment terms. As further detailed in Section VI.B., below, these practices violated applicable accounting regulations because the Company was required to offset the revenue reported by the rebates, commissions, marketing fees and other kickbacks they were providing to distributors and customers. Moreover, ArthroCare was not entitled to recognize revenues on certain transactions because distributors had the right to return unsold products. These fraudulent accounting tactics were later admitted by the Company in its restatement announcement and confirmed by numerous confidential witnesses, as detailed below.

83. For instance, the Atlanta Territory Manager explained how ArthroCare channel stuffed their distributors at the end of the quarter. By virtue of conversations with his regional manager, this witness noted that customers were incentivized in order to meet numbers and that this was done nationally. According to the East Coast Manager for ENT,[51] ArthroCare would get distributors to take big orders so that they could make numbers. He stated "as far as distributors, and getting them to take large orders so they could make certain quarter numbers or year numbers, and possibly taking a return later on, that happened quite a bit. . ." This former employee explained that higher-ups, such as Matt Janer (the National Sales Manager), John Tighe (an Executive Vice President), and Defendant Baker, made arrangements with certain large distributors to take big orders in, with extended terms to pay it, and if distributors were unable to pay it, they would take it back later on, primarily so they could make the quarterly number.

84. Specifically, the East Coast Manager for ENT noted that Boracchia & Associates ("Boracchia"), a distributor in the San Francisco area, was the Company's largest distributor. He

---

[51] The former manager of the east cost for the ENT division was employed with ArthroCare for six years and left the Company in early 2006 ("East Coast Manager for ENT").

stated that Boracchia was a good account because they took products from all three of ArthroCare's divisions. This witness stated that "they were always asked to take very large, extremely large orders, primarily for orthopedic and ENT, at the end of the quarter to be able to make the number, and gave extended terms." The East Coast Manager explained that extended terms meant that payments might be stretched out to either 120 days or whatever was needed, and that Boracchia could return products if they did not need it later on. With respect to Boracchia, the East Coast Manager stated that the distributor took in enough inventory to make or break the Company's number.

85.     ArthroCare's practice of channel stuffing with Boracchia was also confirmed by the Senior Financial Analyst[52] and corroborated by the Project Manager for Sales Operations.[53] The Project Manager for Sales Operations revealed that the Company loaded up one of its biggest distributors, located in the Bay Area, who distributed all of the Company's product lines, ". . . we'd load them up with close to . . . I think one of the last time it was $700 or $800,000 worth of product at the end of the quarter, and they had special terms." This witness recalled that channel stuffing was common at the end of quarters but "especially at year end." The Project Manager for Sales Operations explained that distributors were induced to place large orders at quarter end because they got special payment terms. For instance, the big distributors received extended payment terms – they were given up to several months to make payment. This witness commented that sales would

---

[52]     The former senior financial analyst was employed with ArthroCare from May of 2005 through November of 2006 ("Senior Financial Analyst").

[53]     The former project manager for sales operations was employed with ArthroCare from 2003 until January 2007 ("Project Manager for Sales Operations"). This witness was responsible for inputting these numbers and although he later took on other functions, would help out when they were short handed or "especially at quarter end when they needed to enter massive amounts of orders."

drop off at the start of new quarter and then the process would have to be repeated in order to hit sales quotas.

86.     Moreover, the Eastern Michigan Sales Representative[54] recalled that "we were given a lot of product to be pushing at the end of the quarter and months.  We were given a lot of product to push out to the doctors and try to get them to do cases and giving them lots of free samples, when in reality we weren't supposed to.  A lot of the wands.  I was giving away quite a bit—we were always trying to double it (the order) – so, if they bought ten, we'd give them twenty."  This witness also confirmed that the Company would provide extended payment terms.  The Eastern Michigan Sales Representative noted that there were a couple of customers that had 180 days, whereas the normal payment terms were 30 to 60 days.  This witness stated that "there were a lot of extended terms, there were a lot of percentage discounts (prices)."  Further, this former ArthroCare employee noted that "it would kill us" at the beginning of the next quarter because those customers would already be stocked up, and the cycle would repeat itself.

**B.     The Truth is Revealed**

87.     The multitude of fraudulent practices that Defendants engaged in during the Class Period caused ArthroCare's financial statements to be materially false and misleading, and artificially inflated the Company's stock price.  On July 21, 2008, the truth was finally revealed to the market, when Defendants issued a press released attached to a Form 8-K, revealing that the Company would have to restate its financial statements for the years ended December 31, 2006 and 2007, the quarters ended September 30, 2006, December 31, 2006, each of the quarters of 2007 and the quarter ended March 31, 2008.  The press release stated:

---

[54]     The former Michigan sales representative was a direct sales representative assigned to the eastern half of Michigan who worked at the Company from 2005 to 2007 ("Eastern Michigan Sales Representative").

AUSTIN, TEXAS — July 21, 2008 — ArthroCare Corp (Nasdaq: ARTC) announced today that it will restate its financial statements for the years ended December 31, 2006 and 2007, the quarters ended September 30, 2006, December 31, 2006, each of the quarters of 2007 and the quarter ended March 31, 2008 as a result of the determination by the Audit Committee of the Board of Directors on July 20, 2008 that the financial statements for such periods can no longer be relied upon. The restatement follows a recommendation by management that revenue in these previously issued financial statements should be adjusted because: the relationship between the Company and DiscoCare, Inc. during the periods being restated was a sales agent relationship, rather than that of a traditional distributor; and that the sales price of products sold to State of the Art Medical Products, Inc. ("SOTA"), Boracchia & Associates and Clinical Technology, Inc. cannot be considered fixed or determinable upon shipment by ArthroCare during the periods being restated. The Company will therefore account for sales by ArthroCare of products to each of these entities from the third quarter of 2006 to March 31, 2008, under a sell-through revenue recognition method that is appropriate for both of these situations, as opposed to a sell-in method. Under the sell-through method, revenue is not recognized until after the surgery is performed or a subsequent sale to another customer occurs. Sales to these companies for periods prior to the third quarter of 2006 will continue to be accounted for under the previous method of revenue recognition, either sell-in or sell-through depending on the terms of the previous contract with each company.

On July 20, 2008, the Audit Committee discussed the matters disclosed in this press release with management and the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"). The restatement primarily involves the timing of revenue recognition from one period to another and is expected to result in a non-cash reduction in revenue for the periods being restated. The restatement is not expected to affect future cash flows. In addition to the changes from the sell-in method to the sell-through revenue recognition method for the four entities discussed above, the restatement will correct errors identified by management regarding: the classification to record as an offset to revenue for commissions paid by ArthroCare to SOTA, Clinical Technology and Arthroscopy & Medical Equipment International, Inc. on products purchased directly by the distributor as principal and subsequently resold to third parties previously recorded as sales and marketing expense; the classification to record as an offset to revenue of distribution and marketing fees paid to SOTA, Boracchia, Frontier Medical, Inc. and Clinical Technology previously recorded as sales and marketing expense that did not meet the criteria of EITF 01-9 "Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vender's Products);" the allocation of the purchase price for the DiscoCare acquisition on December 31, 2007 under FAS 141, "Business Combinations" as a result of the conclusion that DiscoCare was an agent prior to the acquisition, not a distributor; and a foreign currency translation error in the fourth quarter of 2006 which was identified during management's conversion to the SAP enterprise financial reporting system.

The sales prices to SOTA, Boracchia, and Clinical Technology were not fixed or determinable under Staff Accounting Bulletin 104, "Revenue Recognition," which

sets forth four criteria which are necessary before revenue can be recognized, including that sales prices are required to be fixed or determinable, due to rebates to the distributors if the distributors sold the products at prices below their purchase price from ArthroCare. Not meeting the criteria can result in a deferral of revenue recognition which is what management expects to occur in the restatement.

While the restatement is being completed, the Audit Committee will oversee a review of the scope and nature of the Company's internal controls. That review will be conducted by Latham & Watkins LLP with the assistance of FTI Consulting, Inc. Depending on the results of this review, it may be expanded beyond internal controls. This review is being conducted separately from management's reassessment of the effectiveness of internal control over financial reporting. No conclusions on the effectiveness of internal control over financial reporting or disclosure controls and procedures are expected prior to the conclusion of the restatement and the filing of amended filings with the Securities and Exchange Commission (the "SEC").

Management estimates that the effect of the restatement will be a non-cash reduction in revenue in 2006 of $4 million to $7 million and in 2007 of $20 million to $25 million. The estimated effect of the restatement on revenue in the first quarter of 2008 will be a reduction of $2 million to $5 million. Management estimates that the restatement will result in material reductions in operating income and net income for the annual and quarterly periods being restated. All estimates contained in this release are subject to change as management completes the restatement of the financial statements. The Company's independent registered public accounting firm has not audited or reviewed these estimates or ranges. An audit of annual financial statements and/or a Statement of Accounting Standards 100 ("SAS 100") review of quarterly financial statements could also result in material changes to these ranges and estimates.

88.     The market was stunned by this announcement and the price of ArthroCare stock plunged by $17.02, or approximately 42%, to close at $23.21 on unusually heavy trading volume.

**C.     Post Class Period Revelations**[55]

89.     On July 24, 2008, just days following the Company's announcement that it would have to restate certain of its Class Period financial statements, Defendants issued another press

---

[55]     In light of these investigations and because ArthroCare has not yet restated its financial statements, the full extent of Defendants' fraud may not yet have been revealed.  Accordingly, Plaintiffs reserve their right to amend this Amended Complaint to reflect facts revealed through the SEC inquiry, FBI investigation, and the Company's restatement.

release stating that the SEC was conducting an informal inquiry into ArthroCare, which was directly

related to the Company's restatement.

90.     Moreover, on August 28, 2008, news of an FBI probe into the DiscoCare scheme

became public.  Indeed, the Miami field office is currently working on an investigation into Dr.

Kugler at the Palm Beach Lakes Surgery Center, along with the law firm he worked with in the

DiscoCare scam to bilk private insurers.  The North Carolina office of the FBI is now also

investigating the relationship between ArthroCare and DiscoCare.

## VI.     DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND FINANCIAL REPORTING

### A.     False and Misleading Statements[56]

91.     The Class Period begins on May 3, 2006.  On this date, Defendants issued a press

release entitled, "ARTHROCARE REPORTS RECORD REVENUES OF $62.5 MILLION FOR

THE FIRST QUARTER. Net income increases 122 percent," which stated in pertinent part:

> . . . First quarter product revenues were $60.3 million, a 26 percent increase over the $47.8 million recorded in the same quarter of the previous year. Total revenues, which include product revenues, license fees and royalties, for the first quarter were $62.5 million, a 26 percent increase over the $49.7 million reported in the first quarter of 2005.

> ArthroCare reported net income of $7.1 million, or $0.26 per diluted share, for the first quarter of 2006, compared to net income of $3.2 million, or $0.12 per diluted share, reported in the same quarter of 2005.

> *       *       *

> Sales in the Spine business unit increased 15 percent during the first quarter of 2006 compared to the same period in 2005. Spine sales represented 11 percent of product sales in the first quarter of 2006.

> *       *       *

---

[56]     All emphasis is added unless otherwise noted.

"Our strong performance in the first quarter provides us a solid foundation to build upon for the rest of the fiscal year," said Michael A. Baker, president and chief executive officer for ArthroCare. "In the first quarter we generated record revenue and exceeded our objective for earnings growth. The momentum gained during the first quarter positions us well to meet the objectives we've set for 2006."

92.     Also on May 3, 2006, the Company hosted an earnings conference call[57] with various securities analysts to discuss ArthroCare's first quarter 2006 financial results.  Defendant Baker participated in this conference call.  During the opening remarks, Baker commented on the Company's record revenues, strong Spine growth, the Company's strong performance and positioning for fiscal year 2006:

We're obviously very pleased to report Q1 financial results that continue our trend of record-setting revenues with total revenues that equaled $62.5 million for the first quarter. This revenue growth reflects, [we believe], the continued acceptance of our technologies and products [that] are in the medical community. . . .

*        *        *

. . . [S]pine revenues increased 15% compared to the year-ago first quarter. This performance primarily was generated by continued sales growth in the nucleoplasty business, where we saw both improvement in nonprivate payer channel such as workman's comp in the United States . . . .

*        *        *

. . . We are obviously very excited about the way things are going. Great to start a year off like this when you have a strong performance out of the box and you're basically tracking at or ahead of all of your internal plans and metrics and your external guidance. We think we are well positioned to have another great year in '06 . . . .

93.     On May 5, 2006, ArthroCare filed its quarterly report for the first quarter of 2006  on Form 10-Q with the SEC, the period ended March 31, 2006, which was signed by Defendant Baker. The 2006 first quarter 10-Q reaffirmed the financial results announced in the press release above in ¶91.

---

[57]     All conference calls cited herein are direct quotes.  Any spelling inaccuracy they contain are the result of transcription errors.

94.     In addition, the 2006 first quarter 10-Q contained numerous other false and misleading statements. For instance, Defendant Baker asserted that the information contained in the 2006 first quarter 10-Q was accurate. Specifically, Defendant Baker signed a Sarbanes-Oxley ("SOX") certification that stated:

1.  I have reviewed this quarterly report on Form 10-Q of ArthroCare Corporation;

2.  Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this quarterly report;

3.  Based on my knowledge, *the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented* in this quarterly report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

     d.     Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the registrant's audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect ArthroCare Corporation's ability to record, process, summarize and report financial information; and

     b.     ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

95.     Defendants also made the following statements about the Company's disclosure controls and procedures:

As required by SEC Rule 13a-15(b), we carried out an evaluation under the supervision and with the participation of our management, including the CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2006. As part of our evaluation, our management has evaluated whether the control deficiencies related to the reported material weakness in our internal controls over financial reporting continue to exist. Although we have devoted significant time and resources toward remediating our reported material weakness and made progress in that regard, our management has concluded that the control deficiency relating to the reported material weakness had not been effectively remediated as of March 31, 2006.

In light of the material weakness described above, ***we performed additional analysis and other post-closing procedures to ensure that the condensed consolidated financial statements were prepared in accordance with generally accepted accounting principles. Accordingly, management believes that the financial statements included in this report fairly present in all material respects our financial condition, results of operations and cash flows for the periods presented.***

96.     For the reasons stated above in Section IV, Substantive Allegations, and as detailed herein, the statements made in the 2006 first quarter Form 10-Q, the accompanying press release, and the Company's May 3, 2006 earnings conference call set forth in ¶91 through ¶95, which touted

among other things the Company's record revenues and growth in the Company's spine business were materially false and misleading when made or omitted material facts to make such statements not false or misleading.

97.     In addition, they were false and misleading or omitted material facts to make such statements not false or misleading because: (a) throughout the Class Period, ArthroCare was actively involved with DiscoCare in an illicit scheme to avoid traditional health insurance reimbursement hurdles and boost lagging Spine product sales (*see, e.g.*, ¶¶38-65), (b) as part of this scheme, ArthroCare encouraged its sales representatives to create a network of personal injury attorneys, physicians, and facilities who would work together under the DiscoCare Model to aggressively push PDD procedures using ArthroCare SpineWands (*see, e.g.*, ¶¶42-62); (c) ArthroCare created an assembly line approach to PDD procedures with its SpineWands, which encouraged the performance of these procedures regardless of whether they were medically necessary (*see, e.g.*, ¶¶42-58); (d) ArthroCare coached physicians to improperly upcode PDD procedures using its SpineWands to elevate charges associated with PDD procedures (*see, e.g.*, ¶¶44-58); (e) as a result of the DiscoCare Model, ArthroCare dramatically and improperly raised the price of its SpineWands from approximately $1,150 to $7,500 for participants in the DiscoCare Model (*see, e.g.*, ¶¶51-52); (f) ArthroCare improperly encouraged physicians in the DiscoCare network to base their charges on the patient's available liability coverage (*see, e.g.*, ¶¶54-56); (g) ArthroCare's relationship with DiscoCare was at best that of a sales agent and not a distributor (*see, e.g.*, ¶¶42-62; 87); (h) ArthroCare and DiscoCare were related companies; (i) through Defendants' fraudulent schemes, Arthrocare's revenue, operating income, net income, gross profit, net income per share (diluted and basic), and accounts receivable (net of allowance) were materially overstated and its financial statements were not GAAP compliant or "fairly presented" as detailed in Section VI.B.; (j) ArthoCare's Class Period Forms 10-Q and 10-K failed to disclose known trends, demands,

commitments, events, and uncertainties that were reasonably likely to have a material effect on the Company's product sales, revenues, net income, accounts receivable, and gross profit margins as required by Item 303 of Regulation S-K; (k) for the reasons detailed herein, the SOX certifications signed by Defendants and incorporated in the Company' Forms 10-Q and 10-K were false; and (l) for the reasons detailed herein, Defendants' statements regarding the Company's disclosure controls and procedures contained in the Company's Forms 10-Q and 10-K were false.

98.     On August 3, 2006, the Company issued a press release entitled "ARTHROCARE'S 28% REVENUE GROWTH DRIVES 60% INCREASE IN NET INCOME FOR THE SECOND QUARTER," which stated in pertinent part:

> . . . Second quarter product revenues were $63.8 million, a 28 percent increase over the $49.7 million recorded in the same quarter of the previous year. Total revenues, which include product revenues, license fees and royalties, were $66.0 million for the second quarter, a 28 percent increase over the $51.7 million reported in the second quarter of 2005.
>
> ArthroCare reported net income of $7.7 million, or $0.28 per diluted share, for the second quarter of 2006, compared to net income of $4.8 million, or $0.19 per diluted share, reported in the same quarter of 2005.
>
> *       *       *
>
> FIRST SIX MONTHS OF 2006
>
> For the first six months of 2006, total revenues reached $128.5 million compared with $101.4 million in the same period of 2005. The product sales portion of revenue increased to $124.1 million in 2006 compared to $97.5 million in 2005. Net income for the six-month period was $14.8 million, or $0.53 per diluted share, compared to six-month net income of $8.0 million, or $0.31 per diluted share, in the previous year.
>
> *       *       *
>
> Sales in the Spine business unit increased modestly during the second quarter of 2006 compared to the same period in 2005, with spine sales representing 9 percent of product sales in the second quarter of 2006.
>
> *       *       *

"We are pleased to have generated a strong performance from both a revenue and earnings perspective in the second quarter," said Michael A. Baker, president and chief executive officer for ArthroCare. "We continued our recent trend of achieving record quarterly revenues and exceeded our earnings growth target . . . ."

99.     Also on August 3, 2006, the Company hosted an earnings conference call with various securities analysts to discuss ArthroCare's second quarter 2006 financial results. Defendants Baker and Gluk participated in this conference call. During the opening remarks, Baker commented on the Company's Spine revenue growth:

We're obviously pleased to report strong financial performance from both a revenue and earnings perspective in the second quarter. We recorded another quarter of record quarterly revenues, with total Q2 revenues of $66 million, a 28% increase year-over-year. We also exceeded our earnings growth target for the quarter with net income of $7.7 million or $0.28 per diluted share, including the FASB 123(R) related expenses and over $9 million or $0.33 per diluted share without the FASB 123(R) expenses.

\*          \*          \*

. . . Spine revenues increased modestly quarter-over-quarter and represented 9% of product sales. As you'll recall, most of the current revenue in our Spine business is generated by the Nucleoplasty product line, and historically most of that revenue has come from Europe . . . . We are seeing some meaningful progress on Nucleoplasty reimbursement on both sides of the Atlantic and we're excited about what that means for the future.

\*          \*          \*

Taken together, these developments increase our confidence that we are ultimately going to be successful in establishing broad-based reimbursement in all the major markets in the next few years . . . .

100.     In the question and answer session that followed, Defendant Baker falsely responded to a question regarding reimbursement issues:

**Ed Shenkan - Needham & Co. – Analyst-** I wanted to ask you, on Nucleoplasty, it sounds like the clinical data is starting to get out there to the insurers and reimbursement is either happening now or it is going to happen in the future. What are the expectations on what percent of the country is covered with reimbursement now and what are the expectations in the future with the product?

*Mike Baker - ArthroCare Corp. - President & CEO-* . . . And we're obviously treating only a tiny fraction of those people today, but we are seeing meaningful progress on this, and it is being driven by just the stellar clinical results.

*Ed Shenkan - Needham & Co. – Analyst-* . . . So, you didn't get a bunch of insurers onboard though in the last three or four months?

*Mike Baker - ArthroCare Corp. - President & CEO-* . . . The big change in US has been a gradual building of momentum in these workmen's comp situations. And I think that may actually end up leading the private-pay insurers. We've already seen a couple of private insurers in some geographies switch because of that, but we're some distance away from having widespread reimbursement here. But the progress is very clear.

101.    On August 4, 2006, ArthroCare filed its quarterly report for the second quarter of 2006 on Form 10-Q with the SEC, the period ended June 30, 2006, which was signed by Defendants Baker and Gluk. The 2006 second quarter 10-Q reaffirmed the financial results announced in the press release above in ¶98. Further, it contained substantially the same false SOX certification that was included in ArthroCare's 2006 first quarter 10-Q, this time signed by Defendants Baker and Gluk. In addition, it contained statements by the Individual Defendants regarding disclosure controls and procedures that were substantially the same as those contained in ¶94 above.

102.    For the reasons stated above in Section IV, Substantive Allegations, and as further detailed in ¶97 and herein, the statements made in the 2006 second quarter Form 10-Q, the accompanying press release, and the Company's August 3, 2006 earnings conference call, set forth in ¶98 through ¶101, which touted among other things the Company's revenue growth, Spine product sales and progress in reimbursement for nucleoplasty procedures, were materially false and misleading when made or omitted material facts to make such statements not false or misleading. Additionally, such statements were false and misleading or omitted material facts to make such statements not false or misleading because Defendants' increasing Spine product sales were not the product of "meaningful progress" in reimbursement for nucleoplasty procedures or "stellar clinical results" but rather the DiscoCare Model.

103.   On October 26, 2006, the Company issued a press release reporting its financial results for the third quarter of 2006, the period ended September 30, 2006.  This press release entitled, "ARTHROCARE'S THIRD QUARTER 2006 EPS REACHES $0.31 ON REVENUE GROWTH OF 21%," stated in pertinent part:

> ArthroCare Corp.® (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the third quarter ended September 30, 2006 total revenues grew 21 percent to $64.7 million. . . .  On an as-reported basis, ArthroCare's net income grew to $8.7 million, or $0.31 per diluted share, for the third quarter of 2006, reflecting growth in the Company's three major business units coupled with effective cost control.

> \*       \*       \*

> [Mike Baker, CEO of ArthroCare stated:] "Looking ahead to 2007, we are forecasting significant growth opportunities in all business units, are expecting revenue to grow at least 20 percent with continued margin expansion, and anticipating EPS growth to continue to exceed revenue growth".

> THIRD QUARTER FINANCIALS

> Third quarter product revenues were $62.1 million, a 20 percent increase over the $51.6 million recorded in the same quarter of the previous year. Total revenues, which include product revenues, license fees and royalties, were $64.7 million for the third quarter, a 21 percent increase over the $53.6 million reported in the third quarter of 2005.

> ArthroCare reported net income of $8.7 million, or $0.31 per diluted share, for the third quarter of 2006 . . . .

> \*       \*       \*

> Sales in the Spine business unit during the third quarter of 2006 were comparable to the same period in 2005, with spine sales representing nine percent of product sales in the third quarter of 2006.

104.   Also on October 26, 2006, the Company hosted an earnings conference call with various securities analysts to discuss ArthroCare's third quarter 2006 financial results.  Defendants Baker and Gluk participated in this conference call.  During the opening remarks, Baker commented on the Company's Spine revenues:

. . . in Q3 we saw a number of developments in this key [Spine] business that we think bodes very well for 2007 . . . .

\*      \*      \*

Finally on nucleoplasty reimbursement; this product accounts for the overwhelming majority of our spine revenue to date, and its growth has been hampered by a lack of routine reimbursement, particularly in the U.S. But in Q3 we again saw meaningful progress in both United States and international markets with both non-private pay and some private payers . . . .

Given the potential that this product has to drive the economics of the spine business and the overall company, it's hard not to be excited about the prospect of seeing a meaningful improvement in nucleoplasty reimbursement.

105.     In addition, Defendant Gluk made the following statements:

. . . [W]e had a solid revenue growth during the third quarter. Product revenues of $62.1 million and total revenues of $64.7 million. These figures represent a 20% increase in product revenue and a 21% increase in total revenue compared to the third quarter of 2005.

\*      \*      \*

Third quarter reported spine sales remain comparable of the year ago quarter, and represented about 9% of our product sales . . . .

\*      \*      \*

Moving on to 2007, we expect to generate total revenue growth of at least 20%. We are forecasting continued product margin and operating margin improvement vs. 2006. We expect to grow earnings faster than revenue and continue to generate positive cash from the business.

106.     In the question and answer period that followed, Raj Denjoy, a Piper Jaffrey analyst asked about the Company's 20% guidance for 2007.  Defendant Baker responded in relevant part:

On top of that, what we think we're seeing in spine, which is really meaningful improvement in reimbursement  . . . . And, you know, frankly we think we're going to see strong growth in all three of the business units in 2007 and, potentially, even stronger growth in '07 than we're seeing in '06.

107.     Moreover, in response to a question by Wade King, an analyst with Montgomery & Company, Defendant Gluk said:

. . . And I think, going into '07, we see the opportunity in the spine business changing in a very dynamic way and we're planning on spending some money to go after that.

57

108.    Steve Lichtman, a Bank of America Securities Analyst asked "on nucleoplasty reimburse that you talked about meaningful progress and that you'll be investing in that for next year. Can you just flesh out a little bit more in terms of what progress was made during the third quarter on that front?" Defendant Baker responded:

> . . . Now inside the U.S. we have been seeing, over the last couple of quarters, progress not only with what I would call non-private pay cases, which are sort of workman's comp type cases . . . .

> *    *    *

> But even on the private pay side in the U.S. we're now seeing, in several regions around the country, ***insurance companies paying for nucleoplasty that were not paying for it even six months ago***. And I think that that may be a little bit of the spillover effect of making progress on the workman's comp side. ***So I don't care whether we back into it or not, I'm just excited about the fact that we're starting to see reimbursement become no longer as much of a hindrance to this, and frankly we plan on investing to drive this.***

> . . . I think next year's going to be a real pivotal year for the spine business, between what we're seeing with reimbursement in nucleoplasty . . . .

109.    In addition, when asked by Wade King, an analyst with Montgomery & Co., whether "there are actually prospects for a large private payer to make a coverage decision in your favor? Or, do you expect it to be incremental with small payers on an individual case basis following some of the worker's comp payers that have offered favorable coverage decisions to date?" Defendant Baker responded:

> I think the former is true. I think that we're going to eventually see large payers officially make the coverage decision. You know, we have our first ever peer-reviewed presentation on a bid nucleoplasty study at the Euro spine meeting. And, we've now gotten more peer-reviewed articles out on nucleoplasty.

> . . . [I]n the meantime, we see an opportunity to grow that business in a very compelling way, just by exploiting the developments we've seen already. And so, that's why we're getting ready to begin meaningfully adding some resources to the ***spine initiative***, as we go into 2007.

110.    On October 31, 2006, ArthroCare filed its quarterly report for the third quarter of 2006 on Form 10-Q with the SEC, the period ended September 30, 2006, which was signed by

Defendants Baker and Gluk. The 2006 10-Q reaffirmed the financial results announced in the press release above in ¶103. Further, it contained substantially the same false SOX certifications that were included in ArthroCare's 2006 first quarter 10-Q (*see* ¶94) this time signed by Defendants Baker and Gluk. In addition, it contained statements by the Indivdual Defendants regarding disclosure controls and procedures that were substantially the same as those contained in ¶95 above.

111.    For the reasons stated above in Section IV, Substantive Allegations, and as further detailed in ¶97 and herein, the statements made in the third quarter Form 10-Q, the accompanying press release, and the October 26, 2006 conference call set forth in ¶103 through ¶110, which touted among other things the Company's revenue growth and progress with reimbursement hurdles were materially false and misleading when made or omitted material facts to make such statements not false or misleading. In addition, they were false and misleading or omitted material facts to make such statements not false or misleading because Defendants' increasing Spine revenues were not the result of "meaningful progress" or "meaningful improvement" in reimbursement for nucleoplasty procedures but rather the DiscoCare Model; and "the Spine initiative" and "dynamic" change in the spine business referenced by Defendant Baker was in reality the illicit DiscoCare scheme.

112.    On January 19, 2007, Defendants issued a press release reporting its financial results for the fourth quarter of 2006, the period ended December 31, 2006. The press release stated in pertinent part:

> . . . The company also confirmed that it expects fourth quarter earnings of approximately $0.33 per share and full year earnings of approximately $1.17 per share, prior to the cumulative impact of the settlement costs and tax benefit. Fourth quarter revenues are expected to be approximately $69.7 million, at the current First Call consensus. "Revenues increased in all divisions on both a sequential quarter and year-over-year basis," noted Mike Baker, ArthroCare's CEO.

113.    On February 15, 2007, Defendants issued a press release reporting financial results for the year ended December 31, 2006, entitled, "ARTHROCARE'S FOURTH QUARTER 2006

REVENUES REACH $69.8 MILLION - Revenues Reflect Growth in all Divisions, with Substantial

Increase in Spine Business."  This press release stated in pertinent part:

> ArthroCare® Corp. (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the fourth quarter ended December 31, 2006 total revenues grew 18 percent compared to the same period in the prior year to $69.8 million. Revenues grew in all divisions both on a year-over-year and sequential quarter basis. ***Product sales growth was led by a particularly strong 46 percent increase compared to the fourth quarter of 2005 in the Company's spine business due to improved penetration, acceptance by the surgical community and increased reimbursement.***

> On an as-reported basis, ArthroCare's net income grew to $8.2 million, or $0.29 per diluted share, for the fourth quarter of 2006 . . . .

> "We are pleased to report a very successful 2006 with significant revenue and earnings growth across all business units and the accomplishment of numerous strategic milestones which position us well for 2007 and beyond," noted Mike Baker, CEO of ArthroCare.

> FOURTH QUARTER FINANCIALS

> Total revenues, which include product revenues, license fees and royalties, were $69.8 million for the fourth quarter of 2006, an 18 percent increase over the $59.3 million reported in the fourth quarter of 2005 and an eight percent increase over the $64.7 million reported in the third quarter of 2006.

> ArthroCare reported net income of $8.2 million, or $0.29 per diluted share, for the fourth quarter of 2006.

> *        *        *

> REVENUE

> In addition to fourth quarter product sales of $67.2 million, license fees, royalties and other revenue were $2.6 million in the fourth quarter of 2006, which represents four percent of total revenue, compared to $1.9 million, or three percent of total fourth quarter 2005 revenue. International product sales represented 21 percent of product sales during the quarter.

> *        *        *

> ***Sales in the Spine business unit during the fourth quarter of 2006 grew 46 percent compared to the same period in 2005, with spine sales representing 12 percent of product sales in the fourth quarter of 2006.***

> *        *        *

FISCAL YEAR-END 2006

For the fiscal year ended December 31, 2006, total revenues reached $263.0 million, a 23 percent increase compared with fiscal 2005 total revenues of $214.3 million. Net income for fiscal year 2006 was $31.7 million, or $1.14 per diluted share, compared to the fiscal year 2005 net income of $23.5 million, or $0.89 per diluted share . . . .

114.    Also on February 15, 2007, the Company hosted an earnings conference call with various securities analysts to discuss ArthroCare's fourth quarter 2006 and 2006 fiscal year end financial results.  Defendants Baker and Gluk participated in this conference call.  During the opening remarks, Baker commented on the Company's revenue growth, especially in its Spine segment:

> . . . Revenues were 69.8 million, with earnings per share $0.33 prior to the impact of nonrecurring items. Revenues grew on both a sequential and quarter over quarter basis in each of our business units. Most notably our spine business unit posted a strong increase reflected the fruition of years of work, steadily building our presence in that market. The emergence of the spine business as a increasing contributor to our bottom line is the latest example of the way we have systematically expanded ArthroCare's overall market presence and have developed a successful strategy to create and manage growth . . . .
>
> \*       \*       \*
>
> Now as we see the spine business reach the stage where it appears to be poised for significant top-line growth and bottom-line contribution we have the resources to expand again . . . .
>
> We believe that 2007 will be a pivotal year for ArthroCare. We have a very robust calendar of milestones that we believe will make the year particularly interesting, including the continued rapid growth of our percutaneous discectomy product . . . .
>
> . . . Our spine unit had a breakout quarter posting an increase of approximately 46%.
>
> \*       \*       \*
>
> One of the major growth stories of our fourth quarter was in our spine business. We have been working hard to build the base for this business for the past few years and it's very gratifying to now see the beginning of the payoff for all that patient, hard work. From the beginning we've always been confident that our percutaneous vasectomy product could address a significant unmet medical need in a very compelling way, and that the quality of our science and clinical results have been impeccable.

\*      \*      \*

. . . Make no mistake, we still have a great deal of work to do here for this business to reach its full potential but we now believe that we have reached a point where we have a critical mass of favorable payment decisions that will allow us to reinvest to grow this business and we have begun to do that. We believe that the 46% growth rate we achieved in this quarter is a great start and that we can sustain and accelerate that growth over the course of 2007.

The improvement in the payment environment is a key factor that will drive that growth . . . . As our clinical credibility has grown and the payment environment has improved we are also seeing more and more spine surgeons begin to make percutaneous Discectomy a part of there practice, which in and of itself helps to drive growth more rapidly, as they have access to larger numbers of patients . . . . As you'll see in our guidance, we believe our spine business is der -- continue to invest aggressively to exploit our success.

\*      \*      \*

We are currently forecasting top line growth of at least 20% for 2007 with growth accelerating over the course of the year . . . .

. . . In our spine business percutaneous Discectomy will continue to grow in response to improving reimbursement and reimbursement will continue to improve driven by publication and presentation of major peer review studies throughout the year.

\*      \*      \*

A few comments about the spine business. Perhaps one of the most exciting prospects in 2007 product line is the growth we anticipate in our spine business. We have already talked about what we see as the main growth drivers. . . continued improvement in reimbursement, a growing base of spine surgeons as customers who have direct access to larger numbers of patients . . . . As you can see, we have a lot going on in our spine business and we expect those growth drivers to sort of feed off of each other as we get further into the year. Accelerating the growth in revenue.

115.    In addition, Defendant Gluk made the following comments:

Total revenue growth for the quarter was 18% and it would have been approximately 20% if you exclude the lost sales from the distribution of the European noncore product we dropped after the second quarter. For the calendar year total revenues grew 23% and all three business units grew at least 15%. I think that's a remarkable achievement and reflection of our ability to build profitable growing businesses with our technologies across a wide range of medical specialties. This diversified set of growing businesses is a large part of the reason we are confident in our ability to sustain a 20% growth rate for the foreseeable future.

Turning to product margins for a moment, we previously committed to a 1-point improvement in net product margin in 2006. For the fourth quarter our net product

62

margin excluding FAS 123R expenses was 71%, a 1-point improvement over the fourth quarter 2005. Calendar year as a whole our net product margin excluding FAS 123R was 70% which was a 1% improvement over 2005 as well.

*       *       *

Couple of comments on our balance sheet. Inventories increased 3.7 million to 51.5 million over a year ago levels. That represents an 8% increase and that's pretty insignificant in comparison to the 23% increase in annual sales volume so we have made some improvements in inventory over the year.

*       *       *

Turning to 2007, our business outlook for 2007 is as follows. Total revenue growth of at least 20%. By unit, . . . Spine business unit is expected to grow at least 50%. We expect the rate of year-over-year revenue growth to gradually accelerate during the year, starting off with the first quarter. We're also forecasting continued improvement in both product and operating margins and for earnings to grow faster than revenue.

*       *       *

We anticipate the gross margins will improve by 1 point during the year with most of the improvement occurring in product margins. This is somewhat below the level we have seen historically but we do expect our gross margin growth to return to historic levels beginning 2008.

*       *       *

Beyond that this year we're aggressively ramping up resources at our spine and interventional therapies businesses to build a significantly larger businesses we expect them to become.

116.    In the question and answer session that followed, Ed Shanken, an analyst with

Needham & Company stated "the spine growth was dramatic this quarter better than expectations.

Was that a nucleoplasty, micro discectomy or in the parallax?"  Defendant Baker responded:

*That was overwhelmingly percutaneous discectomy.* We have been saying for the last couple of quarters that we thought we were seeing significant progress in the payment environment with these reimbursable approvals and major countries in Europe and progress in non private pay in the U.S. Increasingly some of the private payers also coming on board and I think we really wanted to be in position of using that progress that we were seeing as an explanation for why you suddenly saw revenue growth accelerate as opposed to trying to predict it back in what was happening. Now that we have clear visibility to the fact that we can grow this business we actually began getting that visibility in the fourth quarter we wasted no time in really ramping up the investment in that business and actually began hiring

additional people and making additional investments in that business that were unplanned in the beginning of the fourth quarter and I think that probably helped to contribute a little bit of the increase . . .So we are going to really turn up the fire under that as we get into '07.

117.    In addition, the Defendants responded to a question about regarding the number of

spine sales representative on the street:

**Dave Turkaly  - SIG – Analyst-** You may have mentioned this, but in terms of the spine did you guys talk about the number of reps you had on the Street , and if you did, maybe you could talk about how many accounts you have out there today, what the ASP on the products are and if there's any way you can help us with kind of a U.S./O-U.S. breakout in the strength in the quarter? That would be great.

**Mike Gluk  - ArthroCare - VP-Fin., Admin.-** I'll take the easy one, Dave. I'll tell you that we said we have about 75 feet on the street in the spine business.

**Mike Baker  - ArthroCare - President, CEO-** That's actually a pretty sharp increase from where we were a couple quarters ago. It's reflective -- most of that is reflective of us building up our strength and our focus on the spine surgical market, although we are adding some people as part of this interventional effort as well. . . . I don't have any date in front of me on number of accounts, and I'm not sure that we want to really make that a data point that we give out for competitive reasons. ***We are definitely adding customers and the emphasis in adding those customers is clearly amongst spine surgeons. We are seeing more and more spine surgeons, and as we become more clinical credible, become interested in actually making this therapy a part of their practice.*** That in and of itself can end up being a growth driver because spine surgeons have direct access to much larger numbers of patients. So as they become convinced that percutaneous vasectomy is a good therapy for some subgroup of their patients they don't have to worry about a referral, they have already got them in their practice, ***and as they become convinced that they can make money doing percutaneous discectomy that's going to drive that even further.***

118.    On February 27, 2007, ArthroCare filed its annual report on Form 10-K for the year

ended December 31, 2006 with the SEC, signed by Defendants Baker and Gluk.  The 2006 10-K

reaffirmed the financial results announced in the press releases above in ¶¶112-113.  Moreover,

Defendants Baker and Gluk asserted that the information contained in the 2006 Form 10-K was

accurate.  Specifically, Defendants Baker and Gluk signed false SOX certifications substantially

similar to those found in ¶94, above.

119. The 2006 10-K also contained statements by Defendants stating that the Company's disclosure procedures and controls were effective:

> Management, including our CEO and CFO, has assessed the effectiveness of our internal control over financial reporting as of December 31, 2006. In making its assessment of internal control over financial reporting, management used the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). This assessment included an evaluation of the design of our internal control over financial reporting and testing of the operational effectiveness of those controls. Based on the results of this assessment, management has concluded that our internal control over financial reporting was effective as of December 31, 2006.

120. For the reasons stated above in Section VI., Substantive Allegations, and as further detailed in ¶97 and herein, the statements made in the 2006 Form 10-K, the accompanying press releases, and the February 15, 2007 earnings conference call, set forth in ¶112 through ¶119, which touted among other things the Company's products sales growth, significant revenue, earnings and gross margin growth, 46% growth in Spine sales in the fourth quarter of 2006, improved Spine business "penetration" and "reimbursement," and the overwhelming success of percutaneous discectomy related business, were materially false and misleading when made or omitted material facts to make such statements not false or misleading. In addition, they were false and misleading or omitted material facts to make such statements not false or misleading because: (a) Spine product sales and associated revenue and margin growth was not due to acceptance by the surgical community, improvement in the payment environment, private payers coming on board, or increased reimbursement but rather was the product of the illicit DiscoCare scheme and Model as well as the Company's channel stuffing activities (*see, e.g.*, ¶¶38-67; 82-86); (b) the Company's "investment" in its Spine business was related to the illicit DiscoCare scheme and Model, including its nationwide rollout (*see, e.g.*, ¶¶38-65); (c) the Company sought to add more spine surgeons as "customers" to facilitate improper upcoding to CPT code 63056 to further artificially inflate its operational results and financial statements (*see, e.g.*, ¶¶44-58; 63-65); and (d) based on the widespread and far-

reaching fraud perpetuated by the Individual Defendants, the Company's disclosure controls and procedures were ineffective.

121. On April 26, 2007, Defendants issued a press release entitled, "ARTHROCARE'S FIRST QUARTER 2007 RESULTS EXCEED CONSENSUS ESTIMATES – Spine Business Growth Highlights Record Quarterly Results," which stated in pertinent part:

> ArthroCare Corp. (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the first quarter ended March 31, 2007, total revenues grew 18 percent to $73.7 million, compared with $62.5 million in the prior year's quarter and consensus estimates for revenues of $73.1 million. Excluding sales of products discontinued in 2006, total revenues grew approximately 20 percent.
>
> \*　　\*　　\*
>
> "This was a pivotal quarter for ArthroCare with important developments in each of our business units," noted Mike Baker, CEO of ArthroCare. ***"Our rapidly growing Spine business continued to demonstrate strong revenue growth based upon an expanding customer base and improvements in reimbursement."***
>
> \*　　\*　　\*
>
> Sales in the Spine business unit during the first quarter of 2007 grew 58 percent compared to the same period in 2006, with spine sales representing 14 percent of product sales in the first quarter of 2007.

122. Also on April 26, 2007, the Company hosted an earnings conference call with various securities analysts to discuss ArthroCare's first quarter 2007 financial results. Defendants Baker and Gluk participated in this conference call. During the opening remarks, Baker commented on the Company's Spine growth:

> In Q1 we saw another strong growth performance by the spine business, driven by the same factors that drove growth in Q4 of '06. Essentially all the revenue growth in this business is ***due to the rapid option of the plasma disk decompression procedure, which is benefiting from significant improvements in reimbursement*** on both sides of the Atlantic.
>
> Several of you have asked for additional color on this issue and so I'll take an extra minute to try to provide some. Globally the improvement in reimbursement that we're seeing ***is due to the exceptional clinical results of this procedure, which are increasingly being documented in independent peer reviewed presentation and***

*publications. The increased willingness of our surgeon customers to make this procedure a part of their practices, and the excellent work that our reimbursement resources are doing to help surgeons use this data to drive favorable reimbursement decisions.*

\*    \*    \*

However in the U.S. most of our cases still require extra work to secure reimbursement. We're maintaining the momentum in the U.S. by using our reimbursement resources to support our surgeon customers throughout the process to try and help insure that they are ultimately reimbursed. Whether routine reimbursement is available in their area or if preauthorization is required or if the case ultimately is paid for after some sort of an appeal. It's *obviously extra work for the time being, but given the size of the U.S. market it is clearly worth it, and the really good news is we're currently having consistent success with a broad range of payers, nonprivate pay entities, Workers' Comp. carriers, and most major health insurance plans nationwide.*

\*    \*    \*

*So with PDD a very hot product and a potentially very large market segment, and another potentially hot product and a large market segment about to go into launch, we believe that the spine business is poised for an extended period of rapid growth* . . . .

*The spine business grew 58% quarter over quarter a little ahead of our guidance and we expect the momentum to continue as the reimbursement environment continues to improve* . . . .

We've also made significant progress with a number of significant investments during Q1 that are designed to expand existing market opportunities and open new ones. These include the continued expansion of our sales and marketing activities, particularly in the spine business, and on our expansion into a fourth business focused on surgical oncology. *The spine investments have very rapidly become productive and are already an important part of our growth story today, and we expect the investment into our fourth business unit to be an important start of our growth -- important start of our growth story in the future* . . . .

123.    Defendant Gluk made the following comments regarding the Company's financial

prospects:

*At that time, we told you that we would push to quickly build out our spine business, and the majority of the increase is due to an increased direct sales force and marketing support for our spine business* . . . . Similar with product margin, we are maintaining our original forecast of 1 point improvement over 2006's 15% operating margin. The other income and expense line on the income statement have

improved by $600,000 versus the first quarter of last year. Primarily as a result of us being debt free in 2007.

\*       \*       \*

We expect total revenue growth of at least 20% . . . **and our spine business unit is expected to grow at least 50%. We expect the rate of year over year revenue growth to gradually accelerate during the year. We are forecasting continued improvement in operating margins with most of the improvement occurring in gross margin and for earnings to grow faster than revenue**. . . .

124.    Moreover, Defendant Baker mentioned that PDD would be one of the products that

the Company was counting on to get acceleration the back half of the year:

*Raj Denhoy  - Piper Jaffray & Co. – Analyst-*  Right, right, and then that's my second question, actually. There's a lot of -- obviously you went through a lot of moving parts, a lot of new products being launched. If you had to narrow it down to maybe the two or three big products that you're sort of counting on to get that acceleration the back half of the year, maybe you could just give us that in order from one to three.

*Mike Baker  - ArthroCare Corporation - President, CEO -*  . . .I think the spine number is -- *the spine number is going to continue to be very strong all year long. We are having a lot of success in our reimbursement efforts, really globally on PDD and the two presentations that I mentioned are just both extremely strong, peer reviewed clinical presentations that are going to do nothing but accelerate that. So if I was thinking about the biggest influencers, those would probably be them.*

125.    On May 1, 2007, ArthroCare filed its quarterly report for the first quarter of 2007 on

form 10-Q with the SEC, for the period ended March 31, 2007, which was signed by Defendants

Baker and Gluk.  The 2007 first quarter 10-Q reaffirmed the financial results announced in the press

release above in ¶121.  Specifically, Defendants Baker and Gluk signed false SOX certifications

substantially similar to those found in ¶94, above.  In addition, it contained statements by the

Individual Defendants regarding disclosure controls and procedures that were substantially the same

as that contained in ¶119 above.

126.    For the reasons stated above in Section IV., Substantive Allegations, and as further

detailed in ¶97 and herein, the statements made in the 2007 first quarter Form 10-Q, the

accompanying press release, and the April 26, 2007 earnings conference call, set forth in ¶121 through ¶125, which touted among other things the Company's rapidly growing Spine business, improvements in reimbursement, and expanding customer base, were materially false and misleading when made or omitted material facts to make such statements not false or misleading.  In addition, they were false and misleading or omitted material facts to make such statements not false or misleading because: (a) the Company's "reimbursement resources" was a reference to its joint venture with DiscoCare; (b) the success the Company was having with its "reimbursement efforts" and the "excellent work" they were doing in driving favorable reimbursement decisions was a product of its illicit scheme with DiscoCare and not increased reimbursement from traditional health insurers; and (c) the growth in Spine revenues reported by the Company was not the result of improvements in reimbursement for the PDD procedure but rather the DiscoCare Model (*see, e.g.*, ¶¶38-65).

127.     On July 26, 2007, Defendants issued a press release entitled, "ARTHROCARE REPORTS SECOND QUARTER 2007 REVENUE OF $80 MILLION, EPS OF $0.37, EXCEEDING CONSENSUS ESTIMATES."  This press release stated in relevant part:

> ArthroCare Corp. (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the second quarter ended June 30, 2007, total revenues grew 21 percent to $79.5 million, compared with $66.0 million in the prior year's second quarter. ArthroCare's second quarter net income of $10.4 million, or $0.37 per share, grew 35 percent, compared to net income of $7.7 million, or $0.28 per share a year ago.  This quarterly performance was due to accelerating growth in the Company's Spine and Sports Medicine businesses, reflecting new product launches, high volume manufacturing of key new products, and the benefits from continued investments in sales and marketing. Gross revenue and operating profit margin improvements of 2.6 and 0.9 points, respectively, also contributed to earnings growth.
>
> "Through the first half of this year we have continued to aggressively pursue our core strategy of leveraging our platform technologies to develop breakthrough products and to put the infrastructure, clinical credibility, and reimbursement in place to drive the acceptance of those products in the marketplace," noted Mike Baker, CEO of ArthroCare.

REVENUE

In addition to product sales of $76.6 million, royalties, fees and other revenue was $2.9 million in the second quarter of 2007, which represents four percent of total revenue, compared to $2.2 million, or three percent of total second quarter 2006 revenue. International product sales increased 27 percent over 2006, led by Sports Medicine products.

*Sales in the Spine business unit during the second quarter of 2007 grew 72 percent compared to the same period in 2006, with Spine sales representing 14 percent of product sales in the second quarter of 2007.*

128.     Also on July 26, 2007, the Company hosted an earnings conference call with various securities analysts to discuss ArthroCare's second quarter 2007 financial results.  Defendants Baker and Gluk participated in this conference call.  During the opening remarks, Baker commented on the Company's successful performance:

As you can see from our quarterly financial report we're also right on track to accomplish our financial objectives for the year. We had $79.5 million in total revenue in Q2 which gives us quarter-over-quarter revenue growth of just over 20% or approximately 22% on a comparable basis if you adjust for discontinued product revenue in the second quarter of last year, and Q2's EPS was $0.37 a share, up 32% from the second quarter of 2006.

While there are other themes that we expect to play out in the back half of the year, generally speaking the current quarter's results were driven by . . . *the continued rapid growth of our spine business driven by improvements in the payment environment for percutaneous disk decompression* . . . .

*In the spine business we had another very strong revenue quarter with quarter-over-quarter growth of 72%. This is the third consecutive quarter in which we've seen strong growth in spine which speaks to the sustainability of the positive momentum that we're seeing in this business.*

                    *            *            *

*Currently, the vast majority of the revenue in this business is coming from our PDD product.*

129.     Defendant Gluk delivered the following remarks about the Company's financial prospects:

First revenue which totaled $79.5 million was $1.2 million above consensus and is right on track with our internal expectations for the year. The key drivers were strong results in our Sports Medicine business and our spine business . . . .

\*       \*       \*

*In spine, current quarter percentage growth of 72% is higher than our expected growth rate for the year, however, we do expect to see a lower revenue growth rate although not a lower dollar growth rate as we reach the fourth quarter since our spine revenue growth really started to accelerate in the fourth quarter of 2006.*

\*       \*       \*

Moving on to product margin, our second quarter product margin of 71.7% represents a 2.7 point improvement over the second quarter of last year, and for the first six months our product margin stands at 71.2% which puts us slightly ahead of our calendar year goal a 100 basis point improvement over 2006's product margin of 69.7%. Product mix, ASPs and FX were all contributors to the margin improvement and we continue to expect at least a one-point improvement in calendar year product margin.

\*       \*       \*

Since last year end, inventory has decreased 2.3 million which represents about a 15% improvement in inventory efficiency despite increasing inventories of new Sports Medicine and the ENT product.

\*       \*       \*

130.    In the question and answer session that followed, Defendant Baker discussed Spine

business and sales force growth:

*Ed Shenkan  - Needham & Company - Analyst* -  Mike, you continue to impress us with the spine business growth. Question is did you get more insurers reimbursing in the second quarter, or was this just selling more effectively and the guys are already on board using it more?

*Mike Baker  - ArthroCare - President & CEO -*  At this point I think we can say that we are receiving reimbursement from basically every major insurance company in the United States, and from the national health authorities in Germany and the U.K. as well as some other smaller European countries. That does not mean that reimbursement is routine, we have to do an awful lot of administrative work to get reimbursed, but we are successfully getting paid. *Whether it requires some sort of preauthorization procedure or whether you actually to have go through an appeal process, the good news is right now we can tell a spine surgeon customer basically that if you do a procedure we are very confident you are going to get paid for that procedure.*

There may be some administrative work that has to be done, but we're prepared to support you in getting that work taken care of, so that's--and we do see--continue to see that environment gradually improve, and obviously the change will come when we actually have routine reimbursement *and we don't require all of this extra work,*

71

*and that could both accelerate revenue a little bit as well as reduce some of the administrative costs that we have to invest to make sure that these payments occur.*

\* \* \*

131.    Defendants also responded to questions concerning the Company's gross margin:

***Joanne Wuensch  - BMO Capital Markets - Analyst -***  Okay, your gross margins were quite nice. Should we think about as the go forward rate?

***Mike Baker  - ArthroCare - President & CEO -***  I think we're very confident we're going to make our gross margin guidance for the year, and as we look forward at standard margin now on how it's going to ultimately transition in the gross margin, this year's gross margin goal is clearly achievable, and I think as we said in our preliminary guidance for '08 we're thinking we can get some margin improvement in '08 as well.

\* \* \*

***Mark Mullikin  - Piper Jaffray & Co. – Analyst -***  That's fair enough, and then looking at the gross profit margin improvement here, what's driving that, is that mostly a product mix effect, and if so can you help us understand better the different gross margins of spine versus the rest of the business?

***Mike Baker  - ArthroCare - President & CEO -***  I'll give you a quick color commentary on it. There are multiple factors that are driving gross margin to improve, as you've seen. We've seen steady systematic improvement over time.

\* \* \*

*Finally there is a kind of a gradual favorable mix shift, particularly because our fastest growing products are our highest margin products, and that's been going on really for the better part of the last several years. The spine products obviously have the highest margins,* and cavity has the highest margins. The margins are quite good in Sports Medicine and ENT.

\* \* \*

*The higher margin products, the higher price products are growing a little faster than the lower priced product* . . . .

132.    In addition, Defendant Baker responded to a question from analyst Brian Wong of

First Albany Corporation regarding Spine product sales:

***Brian Wong  - First Albany Corporation - Analyst -***  I was wondering if you could talk a little bit about your spine--maybe drill down a little bit more in terms of where those sales are coming from. Are you still getting significant percentage of your sales

from interventional radiologists, or are the majority of you sales now from spinal surgeons?

**Mike Baker - ArthroCare - President & CEO -** We have an existing customer base of radiologists that have been trained to do the procedure, and those guys haven't gone away **but the growth that we're seeing in the business is overwhelmingly coming from spine surgeons.** I don't have the break out of it in front of me right now, but I would venture to guess that if it's not already true, sometime before the end of the year we are going to see the majority of the revenue in that business is actually coming from spine surgeons.

In fact, we may have already crossed over that point **because the--as the reimbursement picture is cleared up, and as there's now data available which I think really very strong data that sort of pounds the table and says this is a good procedure for patients and if you do it it's going to be a profitable procedure for your practice because you're going to get paid, spine surgeons are looking for profitable effective procedures to add to their practices, and they make up the overwhelming majority of our new customers both here and in Europe. I think that trend is probably going to continue.**

133.    When asked about future growth in the Spine Business, Defendant Baker touted the

PDD procedure and the Company's positioning for high growth:

**James Sidoti - Sidoti & Company - Analyst -** I'm sorry, I joined the call late. I was on another one prior to this, sorry if this is redundant. In the spine number looks very very strong for the quarter. Is there any reason not to think that spine is going to be your fastest growing business in the next several years?

**Mike Baker - ArthroCare - President & CEO -** No, I think given what's already happening with plasma disk decompression . . . . **It looks like the spine business is poised for an extended period of high growth, and obviously given the margins there and size of the markets that's a pretty important thing for the entire company**.

134.    On August 1, 2007, the Company filed its quarterly report for the second quarter 2007

on Form 10-Q with the SEC, the period ended June 30, 2007, which was signed by Defendants

Baker and Gluk.  The 2007 second quarter 10-Q reaffirmed the financial results announced in the

press release above in ¶127.   Specifically, Defendants Baker and Gluk signed false SOX

certifications substantially similar to those found in ¶94, above.  In addition, it contained statements

by the Individual Defendants regarding disclosure controls and procedures that were substantially

the same as those contained in ¶119, above.

135.     For the reasons stated above in Section IV., Substantive Allegations, and as further detailed in ¶97 and herein, the statements made in the 2007 second quarter Form 10-Q, the accompanying press release, and the July 26, 2007 earnings conference call, set forth in ¶127 through ¶134, which touted among other things the Company's rapid growth of Spine business, the improvement in payment environment for PDDs, and high gross margins were materially false and misleading when made or omitted material facts to make such statements not false or misleading.  In addition, they were false and misleading or omitted material facts to make such statements not false or misleading because: (a) the "strong growth" in Spine revenues and "positive momentum" in the Spine business touted by Defendants was not the result of improvements in reimbursement for the PDD procedure but rather the practice of its illicit scheme with DiscoCare; (b) the Company's gross margin improvement was the result of the artificially inflated price of the SpineWands because of the DiscoCare Model as well as the Company's channel stuffing activities (*see, e.g.*, ¶¶44-58; 82-85); (c) the Company's growing spine surgeon customer base was the result of ArthroCare's targeting of Spine surgeons through the promised riches of the DiscoCare scheme, including its efforts to encourage upcoding of PDD procedures using CPT code 63056 (*see, e.g.*, ¶¶44-58); and (d) the reason that spine surgeons were finding this to be a profitable procedure for their practice was because ArthroCare provided the SpineWands free of charge to the surgeons and had taught them to upcode so they could charge three times as much for performing a PDD procedure (*see, e.g.*, ¶¶42; 44-58).

136.     On October 22, 2007, the Company issued a press release entitled, "ARTHROCARE'S THIRD QUARTER 2007 EARNINGS GROW 28 PERCENT; COMPANY INCREASES FOURTH QUARTER GUIDANCE."  This press release stated in pertinent part:

> ArthroCare Corp. (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the third quarter ended September 30, 2007, total revenues grew 21 percent to $78.5 million, compared with $64.7 million in the prior year's third quarter. ArthroCare's third quarter net income

of $11.1 million, or $0.39 per share, grew 28 percent, compared to net income of $8.7 million, or $0.31 per share a year ago. Quarterly performance includes growth in each of the Company's business units, including a 95 percent increase in spine sales, as well as a 3.8 point improvement in gross profit margin.

\* \* \*

REVENUE

In addition to third quarter product sales of $75.5 million, royalties, fees and other revenue was $3.0 million in the third quarter of 2007 compared to $2.6 million in the third quarter of 2006, which represents four percent of total revenue in each of these periods. International product sales increased 35 percent in the third quarter over the third quarter 2006, led by Sports Medicine products in the Company's direct distribution markets.

***Sales in the Spine business unit during the third quarter of 2007 grew 95 percent compared to the same period in 2006, with Spine sales representing 15 percent of product sales in the third quarter of 2007.***

137.    Also on October 22, 2007, the Company hosted an earnings conference call with various securities analysts to discuss ArthroCare's third quarter 2007 financial results.  Defendants Baker and Gluk participated in this conference call.  During the opening remarks, Baker commented on the strong revenue growth in the Company's Spine business:

This quarter we had $78.5 million in total revenue, giving us quarter-over-quarter revenue growth of 21%, which was right in line with both the published consensus and our expectations and earnings were $11.1 million, or $0.39, up 28% from Q3 of 2006, and $0.03 per share ahead of the published consensus. This quarter's strong results were driven by . . . ***very rapid growth in our spine business*** . . . . We also recorded ***strong profitability performance in Q3 with an improvement in both gross and operating margins.*** Based on this strong performance and our visibility to our ability to sustain this improvement as we go forward, we're officially raising our fourth quarter earnings guidance to between $0.48 and $0.50 per share.

\* \* \*

***Next I would like to make a few comments on the spine business. Our spine business had another quarter of very strong revenue growth with quarter-over-quarter revenue growth of nearly 95% over the third quarter of last year. This represents the forth consecutive quarter in which we have seen strong growth in the spine business. The vast majority of the revenue in this business continues to come from our PDD product*** . . . . As I said in the last call, we have PDD reimbursement established in the major countries of western Europe, ***we are well established with the government and worker's comp payment authorities in the US,***

75

*and we're now getting reimbursed, albeit on a case-by-case basis, by all the major private payers in the US as well. While we still have a great deal of work to do with private payers in the U.S. before national coverage guidelines are in place, the addition of this kind of high quality scientific data, to the peer reviewed literature, will only make that work more straight forward.*

138.  Defendant Gluk also remarked on the Company's financial results:

First revenue, which totaled $78.5 million for the quarter, was in line with consensus and on tract with our internal expectations for the year. For the first nine months of the year, revenue growth has been 20% with significant revenue increases in all three business units.

*             *             *

*Once again our spine business continued to grow . . . . I should also point out that the 95% growth in our spine business and the 74% year-to-date growth, is higher than our expected growth for the year.*

*             *             *

Moving to product margin. Our third quarter margin of 71.9%, represents a 4 point improvement over the third quarter of last year. And for the first nine months, our product margin stands at 71.5%, which puts us ahead of our calendar year goal of a 100 basis point improvement over 2006's product margin of 69.7%. Product mix, material cost reductions and international profitability continue to be the main drivers to our margin improvement.

139.  Defendant Baker also responded to questions concerning PDD procedures and

reimbursement issues:

*Ed Shank  - Needham - Analyst -*  Thanks Mike. I have a question on the nuclear plasty products or PDD, as we are calling it now, Percutaneous Disc Decompression, the revenues have been ramping, you know, pretty well. Could you talk about future expectations, you know, long and short-term for the product, and, you know, maybe what roll reimbursement as well as data publications have had?

*Mike Baker  - ArthroCare - President and CEO -*  Well, the data is what's driving the acceptance of the product, really. It's what makes the product credible with surgeons and surgeons, of course, are the ones that control the vast majority of the patients. They are the ones who see patients who have herniated discs. And as the procedures become credible and surgeons have wanted to do the procedure, that has driven improvements in payment globally. *And as I said in my comments, basically now we have reimbursed the product -- its very straightforward in most of the major countries in Europe. Its straightforward with the government payers here in the US, its straightforward with the workman's comp payers, and we are now getting paid -- even though we have to go through, sort of case-by-case approval*

76

*processes. Whether it is pre-authorization or appeal or whatever, we are getting paid by all the major payment authorities here in the US.* . . .

140.    Defendant Baker also answered questions regarding the Company's gross margins:

***Brian Wong  - Broadpoint Capital - Analyst -*** Thanks, again, for taking my question. Just a follow-up on gross margins. Obviously you guys are doing pretty well there with 72%. Do you think that you could continue to improve that and squeeze more?

***Mike Baker  - ArthroCare - President and CEO -*** Oh, yes, absolutely. ***Because again our fastest growing products right now are our highest margin products,*** which means that this mix shift that we have been seeing is probably going to continue, and we continue to have very active . . . and at the same time we're going to -- we should continue to see positive mix shift . . . .

141.    On October 29, 2007, ArthroCare filed its quarterly report for the third quarter of 2007 on Form 10-Q with the SEC, the period ended September 30, 2007 which was signed by Defendants Baker and Gluk.  The 2007 third quarter 10-Q reaffirmed the financial results announced in the press release above in ¶136. Specifically, Defendants Baker and Gluk signed false SOX certifications substantially similar to those found in ¶94, above.  In addition, it contained statements by the Individual Defendants regarding disclosure controls and procedures that were substantially the same as those contained in ¶119, above.

142.    For the reasons stated above in Section IV., Substantive Allegations, and as further detailed in ¶97 and herein, the statements made in the 2007 third quarter Form 10-Q, the accompanying press release, and the October 22, 2007 earnings conference call, set forth in ¶136 through ¶141, which touted among other things the Company's gross margin improvement, Spine revenue growth, and reimbursement improvements were materially false and misleading when made or omitted material facts to make such statements not false or misleading.  In addition, they were false and misleading or omitted material facts to make such statements not false or misleading because: (a) the Company's strong revenue growth of its Spine business which was largely due to sales of its PDD product, was the result of its illicit scheme with DiscoCare; (b) the Company's

gross margin improvement was the result of the artificially inflated price of the SpineWands because of the DiscoCare Model as well as the Company's channel stuffing activities (*see, e.g.*, ¶¶44-58; 82-85); and (c) the Company's payment from major payment authorities in the U.S. was actually driven by settlement payments from casualty insurers through the DiscoCare Model (*see, e.g.*, ¶¶38-52).

143.    On December 14, 2007, Defendants issued a press release entitled, "ArthroCare to Repurchase up to $75 Million of Common Stock: The Company is Also Seeking a Correction to Inaccuracies That Appeared in a Recently Published Article and Reconfirms Its 2007 Estimates." The press release stated in pertinent part:

> AUSTIN, Texas, Dec 14, 2007 (BUSINESS WIRE) -- ArthroCare Corp. (Nasdaq:ARTC), a leader in developing state-of-the-art, minimally invasive surgical products today announced that its Board of Directors has approved the repurchase of up to $75 million of its outstanding common stock. The timing and amount of shares repurchased will be determined by the company's management based on its evaluation of market conditions and other factors with a majority of the repurchases expected to be completed by March 31, 2008.

> "This share purchase signals the confidence of ArthroCare's Board of Directors and management in the ongoing strength and profitability of our business. We expect this share repurchase to be accretive to our EPS and to enhance shareholder value," said Mike Baker, president and chief executive officer of ArthroCare.

> The company also commented on a recent press report alleging that one of the company's reimbursement service providers may have engaged in inappropriate business practices, including an inaccurate allegation that the Massachusetts Attorney General's office was "looking into" ArthroCare's relationship with its service provider. This week, ArthroCare contacted the Massachusetts Attorney General's office and was informed that there was no such investigation. ArthroCare has carefully reviewed the article in question and found numerous material inaccuracies. The company intends to contact the publisher to request a correction of the factual inaccuracies contained in the article.

> "As an organization, we have a well-earned reputation for integrity and ethical behavior which we take very seriously. Our FDA-cleared plasma disc decompression products are globally recognized as being among the most clinically successful and cost-effective spinal therapies. We have carefully reviewed the business practices of ***our service provider and have found no evidence of anything improper in their activities***. In fact, we believe that the application of a disciplined diagnostic and treatment algorithm improves patient selection and outcomes, and that the involvement of experienced professionals in the reimbursement process significantly decreases the chance of administrative errors," added Baker.

The company also reiterated its fourth quarter 2007 and 2008 calendar year guidance: The Company expects revenue growth for calendar year 2007 to be at least 20 percent with GAAP diluted EPS for the fourth quarter to be $0.48 to $0.50 and GAAP diluted EPS for the full calendar year to be $1.48 to $1.50.

For 2008, the company expects revenue growth of at least 20 percent, a 200 basis point improvement in operating profit margin and a 24 percent corporate income tax rate.

144. On January 3, 2008, Defendants issued a press release entitled, "ARTHROCARE ACQUIRES REIMBURSEMENT SERVICE PROVIDER, REAFFIRMS 2007 AND 2008 GUIDANCE." This article stated in pertinent part that:

This acquisition will allow ArthroCare to significantly expand its internal reimbursement capability and to leverage these services across all divisions. The acquisition is not expected to have a material impact on 2008 earnings. "This is another milestone in ArthroCare's continued growth as we continue to bring in-house those capabilities critical to our future," noted Mike Baker, president and chief executive officer of ArthroCare. "Securing adequate payment is a key challenge for all medical device manufacturers but critical for ArthroCare since our core strategy is the development of breakthrough medical devices and device therapies, which do not automatically gain reimbursement. This acquisition will significantly enhance our capabilities to support all of our businesses with a reimbursement service offering and to do so cost effectively."

The Company noted that it currently uses DiscoCare of Margate, Fla., to provide reimbursement support in its Spine business on a contract basis. The company believes that DiscoCare has been successful because it helps health providers follow conservative treatment regimens and maintain rigorous medical records. The acquisition closed on December 31, 2007 and ArthroCare expects the integration of DiscoCare's operations to be completed by the end of the first quarter.

As previously stated, the Company expects revenue growth for calendar year 2007 to be at least 20 percent with strong revenue growth across all business units. Product sales growth in the fourth quarter is expected to exceed 20 percent in both Sports Medicine and ENT business units and exceed 40 percent in the Spine business unit.

145. Also on January 3, 2008, the Company hosted a conference call with various securities analysts to discuss ArthroCare's acquisition of DiscoCare. Defendants Baker and Gluk participated in this conference call. During the opening remarks, Baker commented on the Company's product sales growth in Spine and the acquisition:

In Q4 we saw a very strong finish to what has been a remarkably successful year. We are several weeks away from the earnings release, but I can share with you today that we saw strong revenue growth across all of our businesses in Q4. . . product sales growth in the Spine segment exceeded 40%. Product sales growth for the entire Company was well north of 20% for the quarter and in line with our guidance for both the quarter and the full year.

\*        \*        \*

In the Spine segment, we saw growth in all of our key products.

\*        \*        \*

. . . this acquisition will significantly enhance our capabilities to support all of our businesses and to do so much more cost effectively.

We expect to be able to complete the initial integration of this acquisition in the first quarter, and while we did not expect this acquisition to have a material financial impact, we expect that it will be breakeven in 2008 and modestly accretive thereafter. We obviously see it immediately as a strategic positive.

\*        \*        \*

Here is how DiscoCare fits into our strategy to expand our internal capacity to provide reimbursement support for our customers. ***Physicians who work with DiscoCare have more success in obtaining reimbursement since DiscoCare usually obtains a preapproval for the case before it is performed and then follows up until the case is actually reimbursed. Many physician reimbursement problems are caused by poor documentation and administrative errors. DiscoCare ensures that the documentation is correct and that is correctly processed.*** And in a busy physician's office, it is very easy for authorization of individual cases to fall through the cracks. DiscoCare ensures that this does not happen.

\*        \*        \*

***The DiscoCare model for ArthroCare's Plasma Disc Decompression procedure is actually a highly disciplined treatment algorithm that we believe is the key to successful authorizations and a significant contributor to excellent clinical outcomes.*** In this model a patient has to have a symptomatic herniated disc that can be clearly documented with radiographic evidence usually with an MRI, and then they must fail conservative care for a reasonable period of time, a minimum of three months, and then they must have a positive diagnostic test called a discogram before they can be treated.

Typically only 10 to 15% of the patients who enter this treatment algorithm actually end up being treated with Plasma Disc Decompression. The balance either do not have a documented injury, did better with conservative care or have an injury that requires some other procedure.

80

*In our acquisition due diligence, we found no evidence that PDD is being used overly aggressively or inappropriately by any of our customers who follow the DiscoCare treatment algorithm. In fact, what we do find is that because the patients are so carefully selected, the percentage of patients who experience a clinical improvement is the highest that we have seen. DiscoCare does an excellent job of ensuring that the algorithm is followed and that the documentation is correct and complete, but the only magic in this equation is that the algorithm ensures that only patients that actually need and can benefit from the procedure get treated and that the procedure works*. . . .

\* \* \*

So DiscoCare is not only a natural fit with our strategy to expand our reimbursement assistance, but it has resources running a successful model in spine that could ultimately help support all our business units.

\* \* \*

*In the course of considering the acquisition of DiscoCare, we have not only conducted the normal extensive due diligence as we would with any acquisition, but we also completed additional due diligence work focused on the false and misleading information underpinning these stories.*

DiscoCare currently provides third-party billing for ArthroCare devices. *They do not handle billing for surgeon, hospital or other facility fees, and they do not code procedures for physicians, hospitals or other facilities*. There are some third-party billing firms who provide these billing services for surgeon, hospital and facility fees but DiscoCare is not one of them. DiscoCare does not make payments or receive payments from physicians, hospitals or other facilities and they never have. DiscoCare does not guarantee payments through a physician or a facility. *Like all of our marketing initiatives, the entire DiscoCare program has been carefully vetted and subjected to extensive legal and regulatory review.*

\* \* \*

Several of these pieces have asserted that the Plasma Disc Decompression procedure is experimental, which is factually incorrect. PDD was cleared by the FDA and CE-marked in 2001 . . . . In the US many of the large national private insurance carriers have not established routine coverage guidelines for PDD. This makes the reimbursement process more burdensome.

Yet many of these payers are, in fact, reimbursing procedures with preapproval or upon appeal, and DiscoCare has helped to make this happen . . . .While some major private insurance carriers *still have coverage policies that place PDD in an experimental category*, most of these carriers are also willing to approve PDD cases on a case-by-case basis based on medical necessity.

We believe that we will eventually be able to establish routine coverage for PDD with all of the major payers . . . . All of the available scientific evidence indicates that

PDD clearly works for carefully selected patients, and *we believe it is only a matter of time before we will have routine coverage in place.*

\*　　\*　　\*

Remember that while PDA represents the majority of our spine sales today, there are other fast-growing products in our Spine segment, and the pool of available PDD patients today is larger than you think. *We're able to obtain preauthorization in the US for many private pay patients, and the nonprivate pay opportunity in the US for this procedure is probably more significant than you realize.*

\*　　\*　　\*

*Many surgeons routinely use our products to treat these nonprivate pay patients where the payment for the procedure will ultimately come from worker's compensation insurance or litigation settlement.*

\*　　\*　　\*

*Several of these pieces assert that PDD is somehow our only high margin, high growth product, and this is also factually incorrect.*

\*　　\*　　\*

*In addition to the false story about the Mass AG's office, there have also been rumors of numerous other investigations by various other authorities. All of these rumors have proven to be false, and it is interesting to note that one of the private research reports sponsored by the individuals and firms who were spreading these rumors actually confirmed that they could find no evidence of any other investigation.*

\*　　\*　　\*

*So to summarize, we're announcing today that we have significantly enhanced our reimbursement capabilities by acquiring DiscoCare. We do not expect this acquisition to have a material financial impact, but we do expect the deal to be financially breakeven in 2008 and modestly accretive thereafter.* We believe that this acquisition will be strategically positive immediately as we look forward to applying this capability to support customers across all of our businesses as we continue to pursue our core strategy of developing and commercializing breakthrough medical device therapies. We've just finished up a very strong year, and we enter 2008 with tremendous confidence and momentum across all of our business segments.

146.    In the question and answer session that followed, Defendants Baker and Gluk addressed various questions and concerns regarding DiscoCare.  In response to a question concerning the lack of previous disclosure of DiscoCare, Defendant Baker stated:

> **Dave Turkaly  - SIG - Analyst** - Obviously what it appears is that DiscoCare has been a driver. Certainly it seems like an interesting model in that Spine side, and I guess my one would just be I had not heard of it until one of these articles came up. I'm just curious, are there other kind of service providers like that out there that you could bring in, and is there any reason that it was not kind of discussed in the past prior to this kind of article came out?

> **Mike Baker  - ArthroCare - President & CEO -**  Well, over the history of this Company, we have worked with a number of third-party billing companies in one capacity or another, and we work with a couple of them today. *But none of those relationships have ever risen to the level where they required disclosure, and by policy we don't disclose things until they are last at that level.*

147.    With respect to DiscoCare's involvement outside of PDD, Defendant Baker

explained:

> **Ed Shenkan  - Needham - Analyst -**  Could you tell us for DiscoCare, do they do approvals currently outside of PDD and Spine, and how much do they do outside of those areas? Because that is certainly going to be very leverageable long-term for your business.

> **Mike Baker  - ArthroCare - President & CEO -**  Right now basically everything that they do is around the PDD therapy or at least the vast majority of it. *I actually think that the capabilities that they have got in terms of the way they can help practices organize diagnostics, algorithms and decide who to treat and then get preapproval for treatment, it's a very valuable capability, and it is valuable to us across all of our businesses*. . . .

148.    Defendant Baker responded to a question regarding much of the Company's business

was driven by DiscoCare:

> **Brian Wong - Broadpoint Capital - Analyst** - Thanks for holding the conference call. I just wanted to ask you a couple of questions. Would you care to delineate how much of your business has been driven by DiscoCare?

> **Mike Baker  - ArthroCare - President & CEO -** . . *As I think we've talked about before, the data that was in the New York Post article was incorrect. But beyond that, the thing that is important to understand is that DiscoCare was very helpful. I mean they were very helpful in helping us understand what this algorithm had to be to be effective in getting preapproval.*  They have been very helpful in negotiations with worker's comp authorities, and they have been able to get payment for this therapy established on the major national worker's comp contracts, and that has been very important.  They have been helpful in negotiating appeals and negotiating carveouts for the devices themselves.

*        *        *

*Brian Wong - Broadpoint Capital - Analyst -* Is it fair to say then that the percentage of business was substantially less than what was quoted in the article?

*Mike Baker  - ArthroCare - President & CEO -* It would have had to have been; otherwise, *it would have risen to the level of something we might have had to disclose.*

149.    With respect to the Company's decision to acquire DiscoCare, Defendant Baker

stated:

*Brian Wong - Broadpoint Capital - Analyst -*  Okay. That is fair enough. And then in terms of when you decided to acquire DiscoCare, when was that decision made? Was that within the last few weeks with all this breaking out, or was that something that had been decided on before hand and you just -- (multiple speakers)?

*Mike Baker  - ArthroCare - President & CEO -*  We have actually been talking about this for awhile. And we were in the middle of it when all of this stuff broke out, which obviously -- when we started hearing these stories that were really off the wall and they did make any sense, *but we did take extra time to go back and actually look at the facts behind some of these stories. And what we found was kind of what we just told you. That a lot of this stuff was either completely false or so misrepresented that it did not make any sense.*

We probably would have gotten this acquisition completed weeks ago if it had not been for all of the extra work that we had to do. Obviously we wanted to -- *we did not think there was anything to any of this, and we were rapidly able to assure ourselves that there was not, but you certainly want to take the time to look when you're in the middle of listening to all of the noise we have listened to over the last month.*

150.    In response to a question regarding coding discrepancies and miscoding, Defendant

Baker answered:

*Brian Wong  - Broadpoint Capital - Analyst -*  Okay. Fair enough. And then there was some question I believe in some of the research reports about coding discrepancies and miscoding and what not. I was wondering if you could just kind of clarify what is going on with that?

*Mike Baker  - ArthroCare - President & CEO -*  Well, as I said in the prepared comments, we don't code for physicians, full stop, and we don't code for facilities. I know there are some firms out there that do that, but DiscoCare is not one of the firms that does that. *We don't code for surgeons. We don't code for facilities. We don't code for hospitals. And we don't tell them how to code.*

*        *        *

84

*And so our devices end up getting used in a fairly wide variety of disc decompression surgery. And the surgeon decides what his approach to that surgery is going to be based upon the location and the extent of the patient's injury and what he thinks he has to do to cure it. We don't make that decision; we just sell devices that use it in the procedure.* The surgeon's operating notes document what it is he intends to do and what he actually does in the operation with the patient. *And then the surgeon with this facility decides what AMA, CPT code is appropriate to go with those operating notes and then that goes as part of the preapproval package to the insurance company.*

So there is no -- that is another one of those stories that does not make any sense if you understand what it is we're doing and how our devices are used.

151.    With respect to ArthroCare's involvement with lawyers, Defendant Baker stated:

*Brian Wong  - Broadpoint Capital - Analyst -*  . . .There was some mention about collaborating with some lawyers. Any comments on that?

*Mike Baker  - ArthroCare - President & CEO -*  As I said in my comments, our devices have been used since day one routinely by surgeons to operate on people whose injuries may ultimately end up getting paid for by a worker's comp plan or being paid for out of a litigation settlement. *That is not new or unusual at all. So it is entirely factual that from my whole tenure here we have had some customers who routinely operated on people who were involved with litigations.*

*The only thing we're doing now I suppose that is different is we're being much more systematic in organizing those cases to make sure that the proper diagnostic algorithm is followed at least to the extent that these surgeons choose to work with DiscoCare* and that patients only get treated that need to get treated, and that actually results in fewer patients being treated, *a higher assurance that no one is being treated that does not need to be treated*, and better outcomes at the end of it and less cost for everybody.

So our surgeon customers who do work on patients who are involved in litigation who choose to work with DiscoCare are going to have much better documentation and much more precise diagnostics algorithm that they follow, and I think they are going to have a much higher likelihood of getting a good outcome.

So to the extent that we have experienced disciplined professionals involved in this now, it is actually probably more well-organized *and less risky than it has ever been.*

152.    With respect to using DiscoCare with other product lines, Defendant Baker stated:

*Brian Wong  - Broadpoint Capital – Analyst -*  Okay. And last question, DiscoCare is helping you out with percutaneous the PDD procedure. Obviously microdisectomy is a much bigger market than PDD. Is that something that DiscoCare has expertise in and will be moving into?

*Mike Baker - ArthroCare - President & CEO-* Well, what they are good at is making sure that -- is making sure that surgeons follow the treatment algorithms correctly every step of the way and that they document all of the diagnostic work, and they document the fact that they follow the algorithm, and that all of the administrative paperwork is filled out correctly. And they are really good at getting it submitted in a timely manner to the appropriate insurance companies and then following them up with the insurance company until they get the approval. *And then after the surgery is done, they follow up to make sure that the preapproval is actually reimbursed . . . .*

153.    When asked about DiscoCare's function and the model, Defendant Baker stated:

*Bill Plovanic  - Canaccord Adams – Analyst -*  This is definitely going to clean up a lot of the rumors that have been swirling around and get that out of the way. I just have a couple of questions.

I'm just trying to understand DiscoCare in general, so they were a service provider. At any point in time did you ever sell them products or --?

*Mike Baker  - ArthroCare - President & CEO -*  Here is how the model works. *When they get preapproval for a case and the case is scheduled, they would then call us and say, we have preapproval for a case. Sell us a wand. And we would sell the wand to DiscoCare at our contract price, and the case would be done, and then DiscoCare would submit the bill for the wand to the insurance company under the preapproval.* And then DiscoCare would eventually get paid by the insurance company. And so that is as simple as that.

154.    When asked about wand prices and the affects of this pricing on gross margins,

Defendants Baker and Gluk gave the following responses:

*Bill Plovanic  - Canaccord Adams - Analyst -*  Okay. And then I think you mentioned so basically they got the preapproval, then you would sell the wand to them at the contract price, and basically then they would turn around and sell it to the facility. And I guess the question is, what type of increase was that? I mean we're use selling it at like $1000 and they were getting $2000, so you're going to be able to capture all that? Because that is going to be huge growth for the year, and so I am just trying to quantify that somewhat.

*Mike Baker  - ArthroCare - President & CEO-* Well, they were selling it to the insurance company, not the facility. The facility would bill its own fees, and the surgeons would bill his own fees, and then DiscoCare would bill for the wand.

So a private insurance payer would have a preapproval, and then they would ultimately get usually at least three bills. One bill from the surgery center, one bill from the doctor and one bill from DiscoCare. And then they would pay whatever they thought was appropriate of each one of those bills.

*So it is not clear that this is going to cause any increase in the revenue that we see.*

155.    With respect to the financials of DiscoCare and the financial arrangements of the

acquisition, Defendant Baker stated:

> **Beth Senko  - Williams Capital - Analyst -** Okay. My thought was that perhaps that
> they were -- if the acquirees were interested in getting stock, they would have an
> interest in some way of putting out perhaps some misconceptions that would drive
> the stock down, and then, therefore, they would get an extra hit. Are the future
> payments cash payments?
>
> **Mike Baker  - ArthroCare - President & CEO -**  Yes, they are cash payments, and
> *the people who were on the other side of this transaction really and truly are not
> the kind of people who would do something like that.* And one of the sad things
> about this whole exercise has been that some of these people have basically been
> slandered by people who were trying to turn a profit in trading ArthroCare stock.
> *And it really is a shame, and I think it's not out of the question you may actually
> end of seeing some, not from ArthroCare's side, but from the other individuals and
> firms who had negative things said about them, you may actually see some legal
> action taken.*

156.    In response to a question regarding due diligence for DiscoCare, Defendant Baker

stated:

> **James Sidoti  - Sidoti & Co. - Analyst -** A question. When doing your due diligence
> for DiscoCare, is it safe to say that you found that the algorithm that DiscoCare went
> through to get reimbursed was similar to what other companies such Stryker goes
> through to get reimbursed for their PDDs?
>
> **Mike Baker  - ArthroCare - President & CEO** –
>
> *           *           *
>
> . . . But I think also because the service we're providing in helping people get
> preapprovals is, frankly, very well done and very much appreciated by our
> customers. I want to avoid doing more than we already have to educate our
> competition about how to be successful if I possibly can.

157.    When asked why ArthroCare did not build DiscoCare's functions internally and why

DiscoCare was brought in house, Defendant Baker responded:

> **Steven Lichtman  - Banc of America Securities - Analyst -**A few questions. First, as
> you go through this strategically and making the decision to buy DiscoCare, why not
> build those functions internally? What is at DiscoCare that got you immediately
> versus you just building that function internally?

**Mike Baker - ArthroCare - President & CEO-** Well, I mean we actually were trying to build our function internally as rapidly as we could. One of the things that we faced with the growth of the Spine business, particularly in the US, was the *workload and keeping up with all of these requests for preapprovals was very large. And it was in our judgment that we could not build up our internal capabilities as rapidly as we needed to take advantage of the opportunity.* There's really not -- there really is a little bit of a shortage of people who are good at this nationwide.

So we have a small group internally that we're trying to build, but it was nowhere near capable of taking care of the workload that is currently created by the need to get preapprovals for virtually all of our private pay cases and workmen's comp cases in the Spine business.

158.    Defendant Baker discussed PDD revenues:

*So while PDD is a big chunk of our revenue today and it will continue to grow and it's going to be an important part of our product line going forward . . .*

159.    With respect to the Company's billing system and their assumption of risk for

reimbursement, Defendant Baker stated:

**Raj Denhoy - Bear Stearns - Analyst -** Just one question actually. I think one of the things that may be slightly different about this billing system is that the Company it sounds like took control of the device itself, in a sense assumed risk for the device in getting reimbursed. I'm curious whether you are going to continue that practice in a sense provided free of charge and then hope to get reimbursed for it.

**Mike Baker - ArthroCare - President & CEO -** That is exactly what we're going to do. In third-party billing situations, we will do exactly the same work that DiscoCare did before for the device and the device only. And then we will submit the bill to the insurance company, but it's not like we were hoping to get reimbursed. We're actually going to be doing this when we have a preapproval in hand and when we're dealing with an insurance company that we know has an established policy of paying.

So our confidence level that we're going to get paid will be very high. And we have two years of experience at DiscoCare that we can look at that will tell us kind of what the success rate is going to be. And so I think that allows us to sort of manage that process with a lot of confidence.

160.    With respect to the effect of the stories regarding DiscoCare on insurers' willingness

to reimburse for PDD, Defendant Baker stated:

**Raj Denhoy - Bear Stearns - Analyst -** Sure. I was referring more to the story that came out last month, whether that had caused any ripples outside of Wall Street in a sense you are actually seeing anything in the field, or is -- (multiple speakers)?

88

> **Mike Baker - ArthroCare - President & CEO -** No, no one outside of Wall Street
> has even brought the story up with us. And that is despite the fact that the article that
> was posted on the website was one of the most e-mailed articles on the planet that
> day I think. But it was mostly e-mailed to other Wall Street people from what I can
> tell.

161.    Defendant Baker also responded to a question concerning the exclusivity of

DiscoCare:

> **Assaf Guterman - Lazard Capital Markets - Analyst -** Did DiscoCare work
> exclusively with ArthroCare prior to the acquisition?

> **Mike Baker - ArthroCare - President & CEO-** Pretty much, yes, and that is not
> unusual . . . .

162.    In conclusion, Defendant Baker stated:

> Good. Well, I want to say I really appreciate you guys taking the time to talk to us
> today. Obviously this is a relatively small acquisition. ***We don't consider -- we don't
> expect it to be material financially.*** We probably would not have even done a
> conference call about it if it were not for all of the other issues that folks wanted to
> talk about . . . .

163.    For the reasons stated above in Section IV., Substantive Allegations, and as further

detailed in ¶97 and herein, the statements made in the December 14, 2007 and January 3, 2008 press

releases, as well as the January 3, 2008 conference call, set forth in ¶143 through ¶162, which touted

among other things the Company's acquisition with DiscoCare, the Company's due diligence of

DiscoCare, the falsity of rumors regarding DiscoCare and its improper business activities, and the

discipline of the DiscoCare algorithm were materially false and misleading when made or omitted

material facts to make such statements not false or misleading.  In addition, they were false and

misleading or omitted material facts to make such statements not false or misleading because: (a) the

DiscoCare acquisition was suspicious and had the effect of covering up the Company's true

relationship with DiscoCare, the illicit DiscoCare scheme, and inflating ArthroCare's balance sheet

(*see, e.g.*, ¶¶38-65); (b) the DiscoCare Model for PDD was not a "highly disciplined treatment

algorithm" that was the "key to successful authorizations" but an insurance scam by which

Defendants circumvented the traditional insurance reimbursement model to bilk casualty insurers for inflated medical bills (*see, e.g.*, ¶¶38-58; 66-68); (c) physicians who worked with DiscoCare were not having "more success in obtaining reimbursement" because DiscoCare obtains "preapprovals," but rather because under the DiscoCare Model, physicians were being provided LOPs guaranteed by law firms out of settlement proceeds received from casualty insurers (*see, e.g.*, ¶¶42-43); (d) contrary to Defendant Baker's assertions that "there is no evidence that PDD is being used overly aggressively or inappropriately" by any of its customers that follow the DiscoCare treatment algorithm, the DiscoCare Model was designed to push the use of PDD procedures even when not medically necessary and upcoding under CPT code 63056 (*see, e.g.*, ¶¶44-58; 66-68); (e) Defendant Baker's statements on "extensive" and "additional" due diligence and careful "vetting" of DiscoCare were for the purpose of falsely convincing the market of the legality and propriety of DiscoCare's activities as well as the benefits of the acquisition; (f) Defendant Baker's statement that "the nonprivate pay opportunity in the US for this [PDD] procedure is probably more significant than you realize" was a reference to the DiscoCare Model which involved personal injury law firms and casualty insurers, and was actually the driver of the Company's Class Period Spine revenue growth; (g) the price of the Company's PDD SpineWand had skyrocketed overnight and was a significant factor in the Company's gross margin improvement (*see, e.g.*, ¶¶51-52; 63-64); (h) despite Defendants' statements that the acquisition would not have a material impact on its financial statements, it was material and resulted in a restatement of the Company's financial statements where the Defendants improperly accounted for the acquisition (*see, e.g.*, ¶¶71-81; 220-221); (i) DiscoCare was more than "helpful" in driving the Company's Spine revenues, it was the main driver of the Company's significant Class Period Spine growth; (j) the Company's relationship with DiscoCare did rise to the level of something it was required to disclose, although it failed to do so; (k) the "service provider" referred to by Defendant Baker on December 14, 2007 was DiscoCare; (l)

contrary to Defendant Baker's statements that they don't tell surgeons and facilities how to code, through support materials and training, ArthroCare taught its sales representatives to encourage surgeons to upcode using CPT code for 63056 for the PDD procedure, even though CPT code 62287 was the appropriate code to be used (*see, e.g.*, ¶¶44-58); (m) ArthroCare sales representatives were intimately involved in implementing the DiscoCare Model with their customers; and (n) despite Defendant Baker's statement that the people who were on the other side of the DiscoCare Acquisition "were not the kind of people who would do something like that," the individuals associated with the Palm Beach Lakes Surgery Center were intimately involved in the DiscoCare scheme, Mark Izydore was a convicted felon, and each is now under investigation by the FBI and/or SEC (*see, e.g.*, ¶138).

164.    On February 19, 2008, Defendants issued a press release entitled, "ARTHROCARE'S FOURTH QUARTER 2007 REVENUE GROWTH OF 25 PERCENT EXCEEDS CONSENSUS ESTIMATES-- Double digit revenue growth achieved across all business units." This press release stated in pertinent part:

> ArthroCare Corp. (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, reported earnings results for the quarter and year ended December 31, 2007 as follows:

> FOURTH QUARTER HIGHLIGHTS

> - Total revenue increased 25 percent to $87.5 million
> - Gross revenue margin increased four points to 76 percent
> - Operating profit increased five points to 20 percent
> - Net income increased 78 percent to $14.5 million, or $0.50 per diluted share

> HIGHLIGHTS FOR THE YEAR ENDED DECEMBER 31, 2007

> - Total revenue increased 21 percent to $319.2 million
> - Gross revenue margin increased three points to 74 percent

- Operating profit increased one point to 17 percent

- Net income increased 36 percent to $43.2 million, or $1.50 per diluted share

- Cash flow from operations increased 20 percent to $52.7 million

"We continue to systematically leverage our platform technologies in the market place, resulting in breakthrough products, growing clinical credibility within the surgical community and significant increases in product acceptance both in the U.S. and abroad," noted Mike Baker, CEO of ArthroCare.

REVENUE

Fourth quarter product sales of $84.5 million increased 26 percent from $67.2 million in the fourth quarter of 2006. Royalties, fees and other revenue was $3.0 million in the fourth quarter of 2007 compared to $2.6 million in the fourth quarter of 2006, which represents three percent of total revenue in the fourth quarter of 2007 and four percent of total revenue for the fourth quarter of 2006. International product sales increased 22 percent in the fourth quarter over the fourth quarter of 2006, led by the sale of Sports Medicine products in the Company's direct distribution markets.

For the year ended December 31, 2007, product sales increased 21 percent to $307.6 million from $253.4 million in 2006 . . . .

. . . Sales in the Spine business unit during the fourth quarter of 2007 grew 53 percent compared to the same period in 2006, with Spine sales representing 15 percent of product sales in the fourth quarter of 2007. . . .

For the year ended December 31, 2007, … Sales in the Spine business unit grew 68 percent year over year and represented 14 percent of product sales in 2007. . . .

165.    On February 29, 2008, ArthroCare filed its annual report on Form 10-K for the fiscal year ended 2007 with the SEC, the period ended December 31, 2007, which was signed by Defendants Baker and Gluk.  The 2007 annual report reaffirmed the financial results announced in the press release above in ¶164.  Specifically, Defendants Baker and Gluk signed false SOX certifications substantially similar to those found in ¶94, above.  Further, it contained statements by the Individual Defendants regarding disclosure controls and procedures that were substantially the same as those contained in ¶119, above.

166.    In addition, the 2007 10-K made the following false and misleading statements:

Additionally, prior to December 31, 2007 a third-party billing and reimbursement service provider known as DiscoCare, Inc. would purchase devices from ArthroCare and provide them to customers generally at no charge in return for either the agreement by the facility to assign the right to bill private third-party insurance companies and other payers for the device or a letter of protection in a personal injury case. *More specifically, a third-party billing and reimbursement service provider, such as DiscoCare, deals with insurance pre-authorizations, device procurement, inventory management and claims processing to help reduce device costs and the financial collection risk for facilities who use the service in conjunction with a procedure.* Many of ArthroCare's spinal surgery products are leading edge technologies which have not yet received routine coverage decisions from insurance companies and other payers making reimbursement dependent on case by case decisions from various third-party payers. In part because of DiscoCare's history of success in demonstrating the efficacy of the procedures using the ArthroCare devices and their ability to receive reimbursement for such devices, on December 31, 2007, ArthroCare acquired DiscoCare to augment our internal reimbursement resources. *Utilizing DiscoCare's services allows facilities who do not have sophisticated reimbursement processes to focus their efforts on patient care.*

Since 2006, DiscoCare, Inc., another third-party billing and reimbursement service provider, has purchased devices from ArthroCare and provided them to their customers generally at no charge in return for either the agreement by the facility to assign to DiscoCare the right to bill private third-party insurance companies and other payers for the device or a letter of protection in a personal injury case. After a procedure is completed, DiscoCare bills either the applicable insurer or other third-party payer. *More specifically, a third-party billing and reimbursement service provider, such as DiscoCare, deals with insurance pre-authorizations, device procurement, inventory management and claims processing to help reduce device costs and the financial collection risk for facilities who use the service in conjunction with a procedure.* DiscoCare originally worked with ArthroCare on a limited geographical basis and, in the fourth quarter of 2006, *DiscoCare approached ArthroCare about providing their services to ArthroCare customers on a national basis* . . . . In part because of DiscoCare's history of success in demonstrating the efficacy of the procedures using the ArthroCare devices and their ability to receive reimbursement for such devices, and in part to augment our internal reimbursement resources, ArthroCare acquired DiscoCare in December 2007.

DiscoCare, the reimbursement service provider acquired by the Company in December 2007, has had some success in obtaining authorizations for Plasma Disc Decompression procedures, *by following a strict medical and documentation regimen, from all major private health insurance carriers and most workers compensation plans, including carriers who consider Plasma Disc Decompression, or disc decompression procedures in general, to be experimental.* However, there is no assurance that we will continue to be successful in obtaining authorizations for these cases in the future.

93

While we are not aware of any pending investigation concerning DiscoCare, we are responding to a request from the NASDAQ Stock Exchange regarding DiscoCare.

On December 31, 2007, we acquired a third-party billing and reimbursement service provider, DiscoCare, Inc. Since 2006, DiscoCare has been providing surgical devices to facilities, generally at no charge in exchange for the right to bill for such device. ArthroCare paid $24.5 million in cash, net of acquisition costs paid and cash acquired with the potential for future earnouts based on achievement of contractually specified milestones. In accordance with Emerging Issues Task Force 04-01, Accounting for Preexisting Relationships between the Parties to a Business Combination, *we evaluated the purchase as a multiple element contract to separately account for settlement of the preexisting relationship and for the acquisition. Based on our analysis, there was no gain or loss required to be recognized for settling the preexisting relationship. Therefore, the entire purchase price was allocated to the net assets of DiscoCare based on fair market value as of the date of acquisition, primarily accounts receivable, inventory, identified intangible assets, and liabilities assumed with the balance applied to goodwill.*

167.    Also on February 19, 2008, the Company hosted an earnings conference call with various securities analysts to discuss ArthroCare's fiscal year 2007 financial results. Defendants Baker and Gluk participated in this conference call. During the opening remarks, Baker commented on the Company's 2007 financial results:

With 2007 now on the books, I am happy to report that in Q4 we saw a very strong finish to what's proven to be a remarkably successful year. ArthroCare's fourth quarter and calendar year 2007 revenue came in above consensus at $87.5 million and $319.2 million respectively. Revenues grew both on a sequential and quarter-over-quarter basis each of our business units. Our strong fourth quarter is a good indication that the new products we launched this year have taken off. Earnings per share was $0.50 for Q4 and $1.50 for the full year, bringing us to the high end of our adjusted forecast estimate and consensus. . . .

Let's start with a quick review of the fourth quarter. As we previously announced, we saw product sales in each of our business segments increase by more than 20% in the fourth quarter when compared to the fourth quarter of 2006. . . in our spine segment product sales increased by approximately 53%. Altogether, product sales grew by more than 25% in Q4 and over 21% for the full year.

*       *       *

Now to the spine segment, which includes both our spine business unit and the interventional therapies business. While this is the smallest of our business segments, representing just under 15% of our total product sales, it is currently our fastest-growing segment and it contains some of our largest potential opportunities. In the fourth quarter, product sales in this segment again grew rapidly, with year-over-year

94

quarterly revenue growth of 53% and approximately 68% for the full year. *Several years ago we made the strategic decision to focus more of our efforts in this segment on our customers who were spine and neurosurgeons, because we believed they have the opportunity to apply our technology in a much broader array of procedures than the pain specialists that made up the bulk of our early customers* . . . .We have grown the business rapidly, and whereas three years ago less than 25% of our revenue in this segment came from customers who were spine and neurosurgeons, today we estimate over 75% of our revenue in 2008 will be from procedures performed by this key customer group.

\*     \*     \*

PDD is the oldest and smallest of the major commercial opportunities in the spine segment, *but it currently represents the majority of the revenue in this segment. We also saw good growth in PDD sales in both the domestic and international markets in 2007, driven by an improving reimbursement environment* . . . .

\*     \*     \*

168.    Likewise, Defendant Gluk made the following opening remarks:

First, the fourth quarter results. As indicated in our earnings release, total revenue growth for the quarter was 25%, above the 21% run rate for the calendar year. . . .

\*     \*     \*

Turning to product margin, as you will recall our strategy in 2007 was to obtain gross margin improvement, and then partially reinvest a portion of the gains in sales and marketing initiatives. The fourth quarter followed that game plan, with net product revenue gross margins increasing 4 points over 2006 and 3.2 points over the third quarter, due to improved product line mix. All-in, operating margin for the quarter exceeded 20%, which represents a 5 point increase over the prior year's fourth quarter margin of 15%. With gross margin improving above our original expectations, we accelerated some of our plans for 2008 sales and marketing programs into the fourth quarter . . . .

\*     \*     \*

For the calendar year, the revenue growth and gross margin improvement exceeded our original guidance, demonstrating fundamental strength across all business units. . . .

169.    In response to a question regarding average selling prices, Defendant Baker

responded:

*Mark Mullikin - Piper Jaffray - Analyst -* Okay. And the press release mentioned one of the drivers being increasing average selling prices helping the fourth quarter. Can you quantify that? Just overall in your entire business, how much did ASPs

95